Filed 12/9/14  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TONY MURILLO,<br><br>    Defendant and Appellant. | 2d Crim. No. B246522<br>(Super. Ct. No. LA068488-01)<br>(Los Angeles County)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 13, 2014, be modified as follows:

1.  On page 7, in the last sentence in the first paragraph, the word "inference" is changed to "inferences," so that the sentence begins, "The court then allowed counsel to reargue the reasonable inferences …."

2.  On page 8, on line 6 in the first paragraph, beginning "But on March 5," the word "but" is deleted, so that the sentence begins, "On March 5 .…"

3.  On page 10, the last sentence in the second full paragraph is changed to read: "Under these circumstances, the error in allowing these extensive and factually specific questions was harmful and compels the conclusion that the manner in which the prosecution presented its case denied Murillo a fair trial."

4.  On page 11, in the last sentence of the first paragraph, add the word "the" before "trial court," so that the sentence ends, "…but we offer suggestions that may be useful to the trial court."

5.  On page 11, the last sentence and citation in the last paragraph are changed to read: "Absent this infirmity, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)"

There is no change in the judgment.

Filed 11/13/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TONY MURILLO,<br><br>    Defendant and Appellant. | 2d Crim. No. B246522<br>(Super. Ct. No. LA068488-01)<br>(Los Angeles County) |

A prosecution witness takes the witness stand but refuses to answer any questions. The trial court allows the prosecutor to ask the witness more than 100 leading questions concerning the witness's out-of-court statements to prove defendant guilty of several criminal offenses. The questions create the illusion of testimony. This deprived the defendant of a fair trial because he could not exercise his constitutional right of cross-examination. Instructions that cautioned the jury not to regard the prosecutor's questions as evidence did not overcome the extreme prejudice to defendant.

We reverse and remand so that the trial court may explore options that do not run afoul of defendant's constitutional rights.

Tony Murillo appeals a judgment following his conviction of first degree murder of Luis Velasquez (Pen. Code, § 187, subd. (a), 189),[1] attempted murders of Dylan Valencia and Roberto Villatoro (§§ 664, 187, subd. (a)), and possession of a

---

[1] All statutory references are to the Penal Code unless otherwise stated.

firearm by a felon (former § 12021, subd. (a)(1)).  The jury found true allegations that Murillo committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).

FACTUAL AND PROCEDURAL BACKGROUND

Velasquez, Valencia, and Villatoro were members of the North Hollywood Locos ("Locos") criminal street gang.  On January 23, 2010, they wrote graffiti in the territory of a rival gang, the North Hollywood Boyz, and then walked down the middle of Califa Street at about 11:00 p.m., in the same rival territory.  North Hollywood Boyz is an ally of Clanton 14, a criminal street gang with about 80 members.  Murillo is a member of Clanton 14.

Villatoro testified that a man dressed in black approached them and asked, "Where you guys from?"  They responded, "Locos."  The man said "Clanton" and "opened fire."  He killed Velasquez, shot Valencia in the leg, and left a bullet hole in Villatoro's sweater.  The man shot Velasquez from about one foot away, according to the autopsy.

No eyewitness identified Murillo at trial.  Before trial, Valencia identified Murillo as the shooter in a photographic lineup.  But at trial, he refused to testify.  Valencia was represented by counsel and did not invoke the Fifth Amendment privilege against self-incrimination.  The trial court allowed the prosecutor to ask Valencia 110 leading questions about his out-of-court statements and to display the photographic lineups on which he had written that Murillo was the shooter.

When called as a witness, Valencia stated, "I've got nothing to say."  Defense counsel asked that the prosecutor examine Valencia outside the jury's presence.  The trial court denied the request because "[t]here's no claim of privilege here."

In response to each of the prosecutor's questions, Valencia said he had "nothing to say" or did not respond.  After 16 questions, defense counsel renewed her request to excuse the jury and objected to the questions on confrontation grounds.  The

2

trial court denied the request, and allowed the prosecutor to continue with another 94 questions concerning the details of Valencia's prior statements to detectives.

The prosecutor asked Valencia: "Isn't it true . . . that you were shown six photographs [in January] and asked whether you could identify anybody in those photographs?; [D]o you recall telling the detectives that it looks like, but you're not sure, [it is] number four [Murillo]?; [D]o you recall circling number four [Murillo] and putting your initials, the date, and the time on that document?; [D]o you recall writing a statement that says, 'Number four [Murillo] looks like him, but not completely sure. Kind of the same face structure'?; [O]n page one of this exhibit, do you recall signing it under signature of witness in front of the detectives?"

Over defense objection, the trial court allowed the prosecutor to display a photographic lineup dated March 5 on which Valencia circled Murillo's photograph (No. 4) and wrote, "I was walking down Califa St. and number 4 came up to me and my friends and said where you vatos from and we said the lokos and he began shooting and when he was done he said Clanton. . . . I am not a snitch and never will be that's why I didn't say anything." The prosecutor asked Valencia, "Isn't it true . . . that's your writing and you wrote this statement on your own?" Valencia did not answer, nor did he answer any questions on cross-examination.

The prosecutor displayed a photograph and asked, "[I]s that a photograph of your chest?" The trial court interjected, "The record will reflect the witness is looking forward and not looking at the screen. Mr. Valencia, can you see the screen to your right?" "[Answer:] Yeah, I can see it. [The Court:] Is that your stomach? [Answer:] I don't know. [The Court:] You don't know? [Answer:] Hm-mm. [The Court:] Okay. Go back to the previous one. Is that your face? [Answer:] I have nothing to say. [The Court:] That wasn't the question. The question is, is that your face? [Answer:] With all due respect, I have nothing to say, Your Honor. [The Court:] What's the next photograph there? [The prosecutor:] 19. [The Court:] Okay. Is that the left side of your face? The left side of your head? [Answer:] (No audible response.)"

3

The trial court later instructed that the prosecutor's questions were not evidence: "There is no evidence received relating to any statements allegedly made by this witness prior to this trial. Also, any documents displayed to this witness which were not admitted into evidence must not be considered by you for any purpose. Mr. Valencia had no right to refuse to answer questions. The only fact about his testimony that you may consider is his physical appearance before you and his refusal to answer questions by the attorneys and the court. His appearance and testimony must not be considered for any other purpose."

The trial court also instructed, "During the trial, witness Dylan Valencia refused to answer nearly all questions asked by counsel for both sides and by the court. Please keep in mind, as a previous instruction indicated, attorneys' questions are not evidence. The attorneys' questions are significant only if they help you to understand the answers given by the witnesses. To the extent that Mr. Valencia gave no answers, you must ignore the questions asked."

At trial, Villatoro did not identify Murillo in the photographic lineup or in person. Villatoro testified that he could not see the shooter's features in the darkness. He did see that the man was Hispanic, in his late 30's, 5 feet 10 or 11 inches tall, and dressed in black clothes and a "beanie."

Murillo is 5 feet 9 inches tall and was 41 years old on the night Velasquez was shot. He lived across the street from where Velasquez was shot. Murillo arrived at the crime scene, about two hours after the shooting, and told a detective he had been at a party. Murillo was wearing black pants and shoes, and a blue sweater.

Two people who live in the area testified that they heard shots and saw a man in dark clothing run toward the back of an apartment building. They did not see the man's face and did not identify Murillo. They said the man was between 5 feet 6 inches and 5 feet 9 inches tall, and possibly wearing a hoodie.

A surveillance video shows a man in dark clothing run to the back of the apartment building. The man's face is not visible. He tries twice to climb over a back

4

wall, drops something, and then escapes around the end of the wall. An investigator found scuff marks on the wall where the man tried to climb it.

A "touch" DNA sample from the top of the wall above the scuff marks matched Murillo's DNA. There was another contributor to the sample who could not be identified. A criminalist testified that, unlike blood samples that last longer, a touch sample will adhere to a wall that is exposed to the elements for hours or days, depending on environmental conditions. During deliberations, the jury asked to have this testimony read back, and asked for more information about weather conditions at the time of the crime.

A gang expert opined that the shooting was for the benefit of Clanton 14, to protect its reputation and its ally's territory. He described two predicate offenses committed by Clanton 14 members, both of whom were Murillo's relatives.

Murillo's defense included a neighbor who testified that Murillo would sometimes help him work on cars in the apartment building carport near the wall where the DNA sample was found. The neighbor noted that Murillo frequently would spit. Murillo's sister testified that Murillo was at her apartment on January 23 from about 7:00 p.m. until 11:30 p.m. She acknowledged that her son and four nephews belong to Clanton 14.

*Motion to Strike Valencia's Testimony and for Mistrial*

After Valencia's direct examination, defense counsel moved to strike his testimony and for a mistrial. The trial court denied the motions. It found no violation of Murillo's right to confront witnesses because Valencia was present and available for cross-examination. "[Valencia] took the oath. He stated his name. He answered some questions. So, in my opinion, he is available for cross-examination." The court noted there was "very little testimony to strike."

Citing *People v. Rios* (1985) 163 Cal.App.3d 852, 864, the trial court recognized there was no "testimony" from which an inconsistency with any earlier statement may be implied when the witness refuses to answer all questions. The court

5

commented that it was troubled by Valencia's examination, but that jury instructions would clarify that counsel's questions are not evidence.

*Deliberations*

On the fourth day of deliberations, the trial court replaced an ill juror with an alternate. The trial court instructed the newly configured jury to begin deliberations anew.

Murillo contends that before the juror replacement, other errors occurred. After the first jury deliberated four and one-half hours, it announced that it was deadlocked. Over defense objection, the trial court instructed the jury to continue deliberations according to CALCRIM No. 3551, and then excused it for the day.[2]

Within minutes of resuming deliberations the next morning, the first juror wrote a note asking for "an explanation on page 13 of the instructions, the meaning of Dylan Valencia's testimony," and for "a clear understanding of reasonable doubt in layman's terms, possible prosecution's explanation or the defense's closing arguments

---

[2] The trial court told the jury, "I don't consider four and a half hours enough time on a case as complex and given the size of the case," and then instructed it according to CALCRIM No. 3551:

"Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. Please consider the following suggestions.

"Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views.

"Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all the evidence with your fellow jurors. It is your duty as a juror to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror.

"It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective.

"Let me know whether I can do anything to help you further, such as giving you additional instructions or clarifying instructions I have already given you.

"Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing on the form that was previously given to you."

6

from slide show, defining the law only as it relates to reasonable doubt." The trial court reread the reasonable doubt instruction and the special instruction about Valencia. The court then allowed counsel to reargue the reasonable inference to be drawn from Valencia's testimony and reasonable doubt.

On the following day, the trial court replaced the ill juror. Before the jury reached its verdict, the second jury requested and received a "readback" of Villatoro's testimony about "the exact confrontation between them and the suspect" and the gang expert's testimony about gang members' "mission - benefits - payback call out name of person/gang during retaliation." The jury deliberated two and one-half hours and reached a verdict.

## DISCUSSION

### *Motion for Mistrial*

We agree with Murillo that the trial court should have granted a mistrial. The court denied his right to confront witnesses and irreparably damaged his right to a fair trial when it allowed the prosecutor to ask Valencia unlimited leading questions about his out-of-court statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 62; *Douglas v. Alabama* (1965) 380 U.S. 415, 419-420.)

A trial court should grant a mistrial when it is informed of prejudice that is incurable by admonition or instruction. (*People v. Dement* (2011) 53 Cal.4th 1, 40.) We review the denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Cox* (2003) 30 Cal.4th 916, 953.) The trial court is vested with "considerable discretion" (*Dement*, at p. 40) in determining a mistrial motion, because whether a particular incident is incurably prejudicial is "a speculative matter" (*id.* at p. 39).

Valencia's identification was equivocal in January, one day after the shooting. He selected Murillo from a photographic lineup and wrote, "[L]ooks [like] him but not completely sure, kinda the same face structure." He also selected another person from a photographic lineup in January and wrote, "Kinda looks like the susp. Not sure."

7

According to the defense counsel's offer of proof, Valencia was arrested in March for shooting at police officers.  An investigator told him, "You know what, dude?  We are not here to create a new problem for you.  That's not our business.  These guys here [officers who were investigating the Califa Street shooting], as long as you're honest, these guys that talked to you earlier, you stay on their team.  I tell you what, you stay on their team, you're going to be in fine shape."  But on March 5, Valencia unequivocally identified Murillo from a photographic lineup when he wrote, "[N]umber 4 . . . began shooting."  The jury saw the March 5 lineup with Valencia's writing, but defense counsel could not elicit testimony on cross-examination about a corresponding suggestion of leniency.

Valencia's out-of-court statements constituted the only eyewitness identification of Murillo and were a crucial link in the proof.  Murillo's inability to confront Valencia's statements rendered his trial fundamentally unfair.  A prosecutor "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony."  (*People v. Shipe* (1975) 49 Cal.App.3d 343, 349 [trial court violated a defendant's right to confront adverse witnesses when it allowed the prosecutor to ask his codefendants leading questions about their confessions after they invoked the privilege against self-incrimination].)  There is no evidence that Murillo procured Valencia's silence.  (*Douglas v. Alabama*, *supra*, 380 U.S. 415, 420; *Shipe*, at p. 349.)

A defendant has a right to cross-examine witnesses testifying against him.  (*Crawford v. Washington*, *supra*, 541 U.S. 36, 62.)  When a declarant "appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."  (*Id.* at p. 60, fn. 9.)  Valencia appeared for trial and did not invoke the privilege against self-incrimination.  (*People v. Dement*, *supra*, 53 Cal.4th 1, 24.)  But his refusal to answer over 100 leading questions while the prosecutor read to the jury from his police interviews denied Murillo the opportunity to cross-examine on what was tantamount to devastating adverse testimony.

8

This case is like *Douglas v. Alabama*, *supra*, 380 U.S. 415, in which the prosecutor read the entire confession of a recalcitrant codefendant to the jury, after the witness invoked his privilege against self-incrimination, "pausing after every few sentences to ask . . . 'Did you make that statement?'" (*Id.* at p. 416.) The codefendant's confession supplied the "only direct evidence" of the defendant's guilt and was a "crucial link in the proof." (*Id.* at p. 419.) "[E]ffective confrontation of [the codefendant] was possible only if [he] affirmed the statement as his." (*Id.* at p. 420.) Like Valencia, the codefendant did not. As in *Douglas*, inferences from Valencia's refusal to answer "'added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant.'" (*Ibid.*)

This case is unlike *People v. Morgain* (2009) 177 Cal.App.4th 454 in which the prosecutor's five leading questions to a recalcitrant witness did not violate the defendant's right to confront witnesses. In *Morgain*, the defendant's girlfriend told police that he confessed to a shooting. At trial, the prosecutor granted her immunity. She answered a number of preliminary questions and when the prosecutor asked her about her pretrial statement, she affirmatively denied making it. Three times she answered "no" when asked, "You told that to the police, didn't you?" (*Id.* at p. 460.) "[Y]ou told the police, didn't you . . . that . . . ?" (*Id.* at p. 461) "You never told that to the police?" (*Ibid.*) After this substantive testimony, she refused to answer the next five questions. (*Id.* at pp. 461-462.) When she ignored the trial court's instruction to answer, the court excused the jury and held her in contempt. It then struck her entire testimony and admonished the jury to disregard it. (*Id.* at p. 462.) There was strong independent evidence of guilt because two other witnesses identified Morgain. (*Id.* at pp. 465-466.)

Here the independent evidence of Murillo's guilt was not strong. No other witness identified Murillo in this case. The jury did not know the circumstances under which Valencia identified Murillo from the photographic lineup on March 5. It could have drawn the conclusion that Valencia identified Murillo with certainty after officers offered him possible leniency in another case. Unlike Morgain's girlfriend, Valencia

9

gave no substantive testimony. Like the witnesses in *Douglas* and *Shipe*, Valencia refused to answer any questions about his pretrial statements.

The DNA evidence did not cure the problem. The jury had questions concerning this evidence. At the beginning of deliberations, the jury asked to have the DNA expert's testimony read back. It also asked to have the detective's testimony about fingerprinting vehicles on the other side of the wall read back, and asked for "the weather conditions for seven days prior to the incident." The trial court told the jury, "The admission of evidence in this case is closed, so we cannot augment the record in any way." Two hours after the reporter finished reading back the DNA expert's testimony and the detective's testimony, the jury reported, "We are deadlocked."

After the trial court instructed the jury to resume deliberations, the jury returned with more questions, including a request to hear the DNA expert's testimony on redirect. This request was combined with a request for a "clear understanding of reasonable doubt in layman's terms" and for the court to put the special instruction about Valencia's refusal to answer "in layman's terms [because the] last two sentence[s] seem to contradict." The jury was troubled by Valencia's refusal to answer questions and the efficacy of the DNA evidence. Under these circumstances, the error in allowing these extensive and factually specific questions was harmful and compels the conclusion that, but for the manner in which the prosecution presented its case, Murillo was denied a fair trial.

Ordinarily, we assume the jurors follow the trial court's instructions, even when the Confrontation Clause is implicated. (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6.) But there is a point at which the prosecutor's leading questions are tantamount to evidence and overpower the proceedings so that the resulting prejudice is incurable by admonition or instruction. (*People v. Dement*, *supra*, 53 Cal.4th 1, 40.) Valencia's examination reached that point.

10

The trial court was faced with a daunting task to ensure a fair trial to both sides. We cannot offer a specific formula to remedy this predicament, but we offer suggestions that may be useful to trial court.

A trial court has the power to hold a recalcitrant witness in contempt. (Code Civ. Proc, § 128.) Whether this would have been an effective sanction here is problematic. Valencia was in custody on other matters and he could not be held in custody longer than the time it took to try the case.

A hearing outside the presence of the jury pursuant to Evidence Code section 402, while not a guarantee, holds the prospect of a solution. This would give the trial court the opportunity to limit the nature and number of questions asked of the recalcitrant witness and prevent the revelation of unduly prejudicial facts. The court could explore the option of limiting the number of questions. Or it could assist the prosecution and defense counsel in arriving at a possible stipulation read to the jury regarding Valencia's refusal to testify. These methods would allow the prosecutor to conduct the examination "without resorting to the flagrantly suggestive questions he asked." (*People v. Shipe*, *supra*, 49 Cal.App.3d 343, 351.) Had Valencia's examination been properly limited, the jury would have been entitled to draw negative inferences from his refusal to answer questions. When a court determines that a witness has a valid Fifth Amendment right not to testify, it may not require the witness to invoke that privilege in front of a jury. (*People v. Morgain*, *supra*, 177 Cal.App.4th 454, 466.) "'But where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony.'" (*Ibid.*)

But here the prosecutor's detailed questions to Valencia, to which there was no opportunity for cross-examination, denied Murillo a fair trial. Absent this infirmity, we are not convinced beyond a reasonable doubt that the jury could have reached an opposite result. (*Chapman v. California* (1967) 386 U.S. 18.)

11

*Sentencing*

The trial court erred when it imposed a 10-year term for the gang enhancement pursuant to section 186.22, subdivision (b).  Instead it should have imposed a term that Murillo shall not be eligible for parole for a minimum of 15 years, because Murillo received an indeterminate term for murder.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004-1007.)  The issue is moot, but it could arise in the event of a retrial.

### DISPOSITION

The judgment is reversed.

<u>CERTIFIED FOR PUBLICATION.</u>


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.


12

Martin L. Herscovitz, Judge

Superior Court County of Los Angeles

_____

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.