Filed 3/7/22  P. v. Sandoval CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO SANDOVAL,<br><br>Defendant and Appellant. | B304885<br><br>(Los Angeles County Super. Ct. No. NA110719) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jesus I. Rodriguez, Judge.  Affirmed in part, reversed in part, and remanded.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Colleen M. Tiedemann, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant Eduardo Sandoval (defendant) of murdering a fellow member of the Rancho San Pedro criminal street gang, albeit one who belonged to a different clique or subset of the gang. The jury found true an enhancement alleging the killing was gang related. (Pen. Code,[1] § 186.22, subd. (b)(1).) We consider whether the jury's gang enhancement finding is supported by substantial evidence. We are also asked to consider several other contentions that would affect the validity of defendant's convictions (not just his sentence): whether defendant's right to confront witnesses was violated when the prosecutor was allowed to pose leading questions to a recalcitrant witness based on the witness's prior out-of-court statements to police, whether the trial court erred in placing limits on the testimony of the defense's video expert and permitting cross-examination of the expert on work he did in another case, and whether the court improperly allowed victim impact evidence to be presented during trial.

## I. BACKGROUND

### A. The Murder

At approximately 2:20 a.m. on August 17, 2016, Jorge Pereira (Pereira) and Michael Sambrano (Sambrano) were walking to a gas station in San Pedro to purchase cigarettes. They were friends and had spent the day exercising and partying. Both men were members of the Rancho San Pedro (RSP) criminal street gang and belonged to RSP's Santa Cruz clique.

---

[1]     Undesignated statutory references that follow are to the Penal Code.

2

As Pereira and Sambrano walked near a church on Mesa Street, a dark-colored SUV pulled alongside them and stopped. Someone from inside the SUV asked where Pereira and Sambrano were from and Sambrano said, "What?" Sambrano then moved toward the SUV, and defendant got out of the vehicle.

Pereira immediately recognized defendant, having seen him around the neighborhood for years, and knew him as an RSP member who went by the name "Rhino." Although defendant belonged to a different clique of the gang, the "Locos," Pereira initially thought there would not be any trouble because both defendant and Sambrano were older RSP members. But when defendant asked Sambrano what clique he was from and Sambrano responded "Santa Cruz," the two men quickly "got into each other's face" and began "chest bumping." Seconds later, defendant pulled a gun and began shooting. Pereira fled when the shooting started and thought Sambrano had escaped unharmed.

Pereira was wrong. In response to a 911 call placed by a third party, law enforcement found Sambrano's dead body in a parking lot approximately a block and half from the scene of the shooting. According to the medical examiner, Sambrano died from a single gunshot that perforated his lungs and other organs before exiting through his chest.

About an hour after the shooting, officers from the Los Angeles Police Department (LAPD) stopped a vehicle with defendant and another man, Joel Diaz (Diaz) (also a member of RSP's Locos clique and an owner of a Toyota 4-Runner SUV) in the back seat. Pereira subsequently identified defendant as the shooter in a photographic line up (and later during trial).

3

Defendant was charged in an information with one count of murder (§ 187, subd. (a)) and two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1)). In connection with the murder, the information alleged defendant killed Sambrano for the benefit of, in association with, or at the direction of a criminal street gang and with the specific intent to promote criminal conduct by gang members. (§ 186.22, subd. (b)(1).) The information also alleged a gang enhancement in connection with the felon in possession of a firearm count pertaining to the possession that occurred on the day of the murder. Firearm enhancements (§ 12022.53, subds. (b)-(e)) were also alleged.

### B.    Trial
#### 1.    Diaz's refusal to testify

At a hearing outside the presence of the jury, the trial court found Diaz to be in contempt of court for willfully refusing to answer questions despite being granted immunity.

When the prosecution called Diaz to testify during trial, the prosecutor asked Diaz 25 questions. Some of the questions were personal in nature, such as whether he was a member of RSP and whether he recognized defendant. Other questions concerned his movements in the hours prior to the shooting, including whether he told detectives he and defendant left a bar approximately half an hour before Sambrano was shot. Diaz was also asked about events after the shooting, including the traffic stop where he was found in defendant's company. Certain questions posed by the prosecution were also directly related to the Sambrano's death. For example, Diaz was asked if he told detectives that defendant "did what he did on his own rather than . . . planning this out, going hunting for a victim." Similarly, the prosecutor asked Diaz

4

if he told detectives that if he knew what defendant "was going to do that night, step out and start blasting," he would not have used his SUV.

In response to all these questions, Diaz refused to answer. During the remainder of the prosecution's case-in-chief, Diaz was recalled to the witness stand more than once and on each occasion he reiterated his refusal to testify despite the court's order that he do so.

After Diaz first refused to answer questions, defendant moved for a mistrial and argued he had been prevented from cross-examining Diaz because Diaz did not answer any questions. After denying the motion, the trial court instructed the jury as follows: "It is imperative that I talk to you about [the questions put to Diaz]. [The attorneys'] questions are not evidence. The attorneys' questions are significant only if they help you to understand the witness's answers. Do not—do not assume that something is true just because one of the attorneys asked a question that suggested it was true." By a show of hands, the court asked if the jurors needed any further instruction on the matter; none of the jurors indicated such guidance was necessary.

Following additional discussion with counsel, the court further instructed the jurors to "strike the substance of all questions that [the prosecutor] asked of Mr. Diaz, period. [¶] . . . We are asking you to delete from your minds the substance of the questions that [the prosecutor] asked." Again, the court asked for a show of hands if the instruction was unclear; none of the jurors raised their hands. Later, after the close of evidence, the court instructed the jury again that "nothing the attorneys say is evidence" and that they should "not

assume that something is true just because one of the attorneys asked a question that suggests it is true."

Prior to closing arguments, defense counsel preemptively objected to the prosecution arguing any inferences that could be drawn from Diaz's refusal to testify. The court overruled the objection. During its closing argument, the prosecution argued Diaz possessed relevant information about Sambrano's murder but refused to disclose that information "to protect the defendant." The defense again moved for a mistrial and the trial court denied the motion.

> 2. *Pereira's testimony about his police interview and his reaction to a photograph of Sambrano's body*

On direct examination, Pereira admitted he initially denied any knowledge of the shooting when he was interviewed by police.[2] He explained he subsequently decided to be truthful after the police showed him a photograph of Sambrano's body "laying on the ground dead, bled out."

Over a defense objection that the photograph "assumes facts not in evidence," the prosecutor asked Pereira, "When you saw the picture, how did you feel?"[3] Pereira responded the photograph made him "sad" because "nobody was going to do anything about it. It was just, like, they left it like that, dead.

---

[2]     Pereira's testimony regarding his police interview was the subject of extensive cross-examination.

[3]     In ruling on the objection, the trial court did not indicate it understood the objection to mean anything other than what defense counsel said; the court simply stated, "Overruled."

6

His family was there. His sisters were crying. And I was thinking—you know [¶] . . . [¶] That it's fucked up." Pereira then explained that thinking about the situation made him want "to do something."

### 3. Gang expert testimony

The prosecution's final witness was its gang expert, LAPD Officer Robert Castruita (Castruita). At the time of the murder, Castruita was assigned to a gang suppression detail which included the San Pedro area.

Castruita testified that during his tenure with the gang unit he had "lots of contact" with RSP members, averaging 20 custodial and/or consensual contacts per week. As a result of his extensive prior contacts with RSP members, Castruita had testified previously in other matters as an expert on RSP.

According to Castruita, RSP, which claims the City of San Pedro as its territory, had approximately 500 members, of which 150 were active. Castruita testified RSP was composed of several male and female cliques or subsets, with two of the male cliques being Santa Cruz and Locos. According to Castruita, each RSP clique claims a separate subdivision of the overall territory claimed by RSP. He did not identify which parts of the city were claimed by which cliques or identify which clique claimed the area around the site of the murder. Castruita did testify that although RSP cliques lay claim to separate areas of the city, the members of each clique are "still members of the overall gang, Rancho San Pedro." He did not elaborate.[4] Nor did he state

---

[4] Castruita did not testify about the history or organizational structure of RSP or any of its cliques, nor did he specifically

7

whether every member of RSP belonged to a different clique or whether some members claimed allegiance only to the umbrella organization.

Castruita testified that RSP's primary activities were murder, attempted murder, shootings, firearm trafficking, narcotic trafficking, robberies, vehicle thefts, and vandalism. He did not offer an opinion on whether some or all of those primary activities were shared by all or some of RSP's constituent cliques.

The prosecution introduced two certified court records during Castruita's testimony to establish the predicate pattern of gang crimes that must be proven for the criminal street gang enhancement alleged against defendant to be found true. The first record revealed Arturo Manzanero (Manzanero) was convicted of murder and possession of a firearm for conduct occurring in February 2011. The second court certified record revealed Edward Benavidez (Benavides) was convicted of murder, attempted murder, and possession of a firearm for conduct occurring in June 2009. Although Castruita testified he knew both Manzanero and Benavides through prior contacts and believed each to be RSP members, he did not testify he had personal knowledge of the crimes for which Manzanero and Benavides were convicted.[5] In addition, Castruita did not

---

identify or explain any of the information upon which he relied in reaching his opinions about the activities and operation of RSP and its various cliques.

[5] Defendant did not object to Castruita's apparent lack of personal knowledge of the predicate crimes. After this case was fully briefed, our Supreme Court held in *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*) that predicate offenses are case-specific facts that cannot be established solely by the testimony of an

identify the RSP cliques, if any, to which Manzanero or Benavides belonged.

Turning to defendant himself, Castruita testified defendant admitted to him that he was a member of RSP. Castruita also opined defendant was a member of RSP's Locos clique.

The prosecutor presented a hypothetical scenario to Castruita that was intended to track the facts of the case, asking him to assume, among other things, that two Santa Cruz clique members were walking down Mesa Street when an SUV stops and the front passenger, a RSP Locos clique member, asks the two men for their gang affiliation; when one of the Santa Cruz members answers, "Rancho," the front passenger inquires further as to which clique they belong, to which the same Santa Cruz member replies, "Santa Cruz"; the front passenger responds by exiting the vehicle and drawing a pistol, causing the two Santa Cruz members to flee; the front passenger gives chase and opens fire, striking the Santa Cruz member who replied to the queries in the back with one round; the wounded man continues running until he collapses and dies approximately a block and a half from the scene of the shooting; the detectives investigating the murder interview the owner of the SUV who is later called as a witness at trial and, despite being instructed by the judge to answer the questions put to him by the prosecutor, refuses to do so.

_____

expert who has no personal knowledge of facts necessary to satisfy the prosecution's burden. (*Id.* at 826, 838-839.) As will become clear, we need not consider *Valencia*'s impact on this appeal, nor do we need to consider the impact of Assembly Bill No. 333 (2021–2022 Reg. Sess.), which the parties also have not briefed (see generally *People v. Lopez* (2021) 73 Cal.App.5th 327, 344-346).

In response to the hypothetical, Castruita opined the shooting was for the benefit of and in association with both RSP and the Locos clique. According to Castruita, the shooter in the hypothetical "was trying to represent the clique that he was from when he reacted to the response that was given by the victim. [¶] He wanted to show that he was—he was willing to demonstrate how violent his clique is; therefore, shooting the victim. He knows that that type of conduct will get spread to the community and not only through the community [but also] through the gang and other gangs; therefore [the shooting] promote[d] . . . and elevated his status within the gang." Castruita testified that even though he was unaware of any prior incidents of violence between the Locos and Santa Cruz cliques, he was aware of violence between other RSP cliques. According to Castruita, intra-gang violence, including the murder of another gang member, benefits the gang: "[B]y weeding out the weak or weeding out different members of the gang that don't fit in or don't go with the rules, it actually makes the group smaller but yet stronger because you are eliminating people that they don't believe belong within that group." Castruita testified further that for gang members respect or fear through violence was paramount: "So if it takes killing another member to promote within the gang, then that's what they do. And that's how the gang forms its hierarchy . . . by promoting its members. They don't get to just promote without doing something for the gang. So that's how these types of crimes occur."

Castruita additionally testified the murder in the hypothetical was carried out in association with a criminal street gang because the shooter did not act alone but with another gang member, who when called to testify refused to do so. Castruita

explained one of the guiding rules for Hispanic street gangs, including RSP, is "you shall not cooperate with the police. You shall not snitch." In view of this "code of silence" and the accompanying fear of retribution, Castruita was not surprised that a gang member would refuse to testify at another member's trial for murder.

During closing argument, the prosecution argued the criminal street gang allegation should be found true because at the time of the shooting defendant was with Diaz, "a person [defendant] trusts because he is a fellow [RSP] gang member from the same clique" and the victim was from "a different clique than the defendant's clique."

### 4. *Video evidence expert testimony*

During its investigation into the murder, police obtained surveillance video footage from two cameras positioned on a church near the site of the shooting; portions of the footage were played for the jury. During the direct testimony of the detective who recovered the video, defense counsel unsuccessfully objected to some questions asking the detective to interpret various images on the video. Counsel, for instance, objected to the detective offering his opinion on the make and model of an SUV seen in the surveillance footage minutes before the shooting and then again at the time of the shooting. The objection was overruled and the detective testified the vehicle was a Toyota 4-Runner. During closing argument, the prosecution argued the vehicle seen in the surveillance video was Diaz's Toyota 4-Runner.

The sole witness called by the defense was Michael Jones (Jones), a court-appointed video expert. Prior to Jones testifying,

11

the court held an Evidence Code section 402 hearing to consider certain enhancements Jones made to the surveillance footage obtained from the church's cameras.[6]

Although the court ultimately admitted the enhanced videos prepared by Jones and allowed him to testify about the enhancements,[7] it repeatedly cautioned the defense that Jones would not be allowed to offer testimony interpreting the videos because Jones admitted he was not a video identification expert. When defense counsel complained this limitation on Jones's proposed testimony was contrary to the latitude given to the detective who testified about the videos, the court reaffirmed its ruling, stating Jones "doesn't have the expertise in characterizing any person. [¶] . . . [¶] So that's off the table, so to speak, meaning he is not going to be testifying or characterizing any movements."

When Jones testified, the trial court sustained the prosecutor's objections to direct examination questions asking if the video showed movement consistent with a person using a cellphone, if there was a person in a particular video segment, and if there was light reflecting on a car window. During cross-

---

[6] Among the enhancements were magnification, insertion of vector shapes and arrows to highlight images and movements, slowing down selected images, "looping" or replaying certain images to avoid repeated re-windings of the video, and freezing certain images.

[7] The trial court sustained the prosecution's objection to one "experimental" video prepared by Jones which displayed images from both church cameras side-by-side because the images were from different moments in time. On appeal, defendant does not challenge this ruling.

examination, the prosecutor questioned Jones, over defense objection, about his preparation of a video exhibit in another criminal matter. In that unrelated proceeding, the defense attorney withdrew the exhibit prepared by Jones after another trial judge suggested it was misleading. With the trial court's permission, the prosecution quoted portions of the reporter's transcript in the unrelated case in which the trial judge, during the colloquy with Jones, asked how his preparation of the video could not be misleading.

In his closing argument, defense counsel played Jones's enhanced version of the church surveillance videos and used it to argue defendant did not murder Sambrano.

### 5. *Verdict and sentencing*

The jury found defendant guilty on all counts charged and found all alleged gang and firearm enhancements true. The trial court sentenced defendant to an aggregate sentence of 78 years to life in prison. In addition, the court imposed a $5,000 restitution fine, a $5,000 parole revocation fine which was stayed pending completion of parole, a court security fee, and a court facilities assessment.

## II. DISCUSSION

The jury's gang enhancement true findings are unsupported by substantial evidence. The prosecution's theory on the gang enhancement was premised on an organizational or associational connection between defendant's clique, Locos, and the umbrella gang, RSP. The sole effort to introduce evidence offered in support of that theory came from the prosecution's gang expert, but the expert put forward no testimony or other evidence that would explain the relationship between the

13

umbrella gang and defendant's clique and permit the requisite connection between RSP and Locos.

Defendant's remaining contentions lack merit.[8] Defendant's right to confront witnesses was not violated when the trial court allowed the prosecution to question Diaz because there was independent evidence of defendant's guilt (Pereira's eyewitness testimony) and the court repeatedly instructed the jury to disregard counsel's questions, even going so far as granting a defense motion to inform the jury that the questions themselves were stricken and should not be considered. The trial court did not abuse its discretion in permitting cross-examination of the defense video expert. The court's evidentiary rulings regarding description of video footage by defendant's expert do not merit reversal because they were not erroneous in one respect and, even insofar as there was any error, the error was not prejudicial: the defense was allowed to present to the jury its expert's enhancements to the video surveillance from the church's cameras and during closing was further allowed to argue without constraint that the videos exonerated defendant. Defendant's

---

[8] Given the need for resentencing, we decline to reach defendant's argument pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, that the trial court erred by imposing various fines and fees without first determining his ability to pay those amounts. On remand, defendant—if he should choose to do so—may argue his inability to pay fines and fees then. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"].)

claim that the trial court erred by allowing Pereira to offer victim impact testimony is forfeited because the theory of reversal now urged was not raised in the trial court.

A.    *The Gang Enhancements Fail for Lack of Sufficient Evidence*

1.    *Standard of review*

In considering a challenge to the sufficiency of the evidence to support a criminal street gang enhancement, "[w]e apply a deferential standard of review." (*People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*).)  "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

15

2. *A section 186.22, subdivision (b)(1) enhancement requires proof of an organizational or associational connection between the group that committed the predicate acts and the group allegedly associated with or benefitted*

Section 186.22, subdivision (b)(1) authorizes enhanced criminal punishment for "a person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) A "criminal street gang" is defined as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts[,] . . . having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) A "'pattern of criminal gang activity' means the commission of . . . or conviction of, two or more of [certain enumerated offenses]" that "were committed on separate occasions or by two or more members." (§ 186.22, subd. (e)(1).)

In *Prunty*, our high court considered "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Prunty*, *supra*, 62 Cal.4th at 67.) The court held that "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the

16

prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at 71.) "The evidence must demonstrate that an organizational or associational connection exists in fact, not merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization. [Citation.] Although evidence of self-identification with the larger organization may be relevant, the central question remains whether the groups in fact constitute the same 'criminal street gang.' In making the required showing, moreover, the prosecution must do more than simply present evidence that various alleged gang subsets are found within the same broad geographic area. . . . The prosecution must introduce evidence of the alleged subsets' activities, showing a shared identity that warrants treating them as a single group. . . . The key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single 'organization, association, or group.' (§ 186.22(f).)" (*Id.* at 79-80.) The prosecution, in other words, "must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same." (*Id.* at 81; see also *id.* at 76 [the prosecution must present evidence from which the jury can "reasonably infer that the 'criminal street gang' the defendant sought to benefit—or which directed or associated with the defendant—included the 'group' that committed the primary activities and predicate offenses"].)

Our Supreme Court reversed the section 186.22, subdivision (b) enhancement in *Prunty* because the testimony offered by the prosecution's gang expert failed to establish an organizational or associational connection between the umbrella

gang and its subsets. The evidence showed Prunty was a member of a particular subset of a larger Sacramento-area gang. (*Prunty*, *supra*, 62 Cal.4th at 68-69, 91.) "The prosecution's gang expert testified about [the umbrella gang's] general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets," which were different than the subset to which Prunty belonged. (*Id.* at 67.) "The expert did not, however, offer any specific testimony contending these subsets' activities connected them to one another or to the [umbrella gang] in general." (*Ibid.*; see also *id.* at 82-83.) Our Supreme Court accordingly held the testimony offered by the prosecution's gang expert was "conclusory and essentially of no use to the fact finder" because the expert did not "describe any facts tending to show an organizational or associational connection among the . . . subsets he described," "articulate any reasons for concluding that all such subsets are part of a single criminal street gang," or "describe the material he relied on in reaching his conclusions—implicit or otherwise." (*Id.* at 85.)

> 3. *There was little evidence of a connection between RSP and defendant's clique, and what evidence there was is impermissibly conclusory as in* Prunty

Here, just like *Prunty*, there was a critical disconnect between what the prosecution was required to show and the evidence offered by the gang expert. The prosecution sought to show that Sambrano's murder was in association with and benefitted both RSP and its Locos clique. This decision dictated the type of evidence the prosecution needed to introduce.

18

Castruita, however, did not offer any facts about RSP other than a generalized description of the territory it claimed, its size, one shared sign, its primary activities, and the two predicate crimes. There was no testimony about RSP's origins, evolution, or current organizational structure, especially as it related to its asserted cliques. With regard to the Locos clique, Castruita did not provide any evidence whatsoever—nothing about the specific territory it claimed, its size, history, shared signs, colors, principal enemies, primary activities, organizational structure, or its purported collaborative connection with the umbrella gang. Castruita's testimony was not only devoid of any organizational facts about RSP and its Locos clique, but it was also bereft of reasons for why the Locos clique should be considered part of RSP. Although Castruita testified he had "lots of contact" with RSP members, he did not offer any testimony about how much contact, if any, he had with members of the Locos clique. Other than his tenure on the gang suppression detail, Castruita did not provide the jury with any other bases for his expertise regarding RSP and its asserted cliques. Castruita's testimony, in short, did not provide evidence that the group defendant acted to benefit or acted in association with was the same as the group that committed the predicate offenses.

Because Castruita's opinions were conclusory regarding RSP, the Locos clique, and the purported collaborative connection between the two, the jury's true finding on the gang enhancement was not supported by substantial evidence. (*Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 253 ["An expert's opinion is only as good as the facts on which it is built"]; accord, CALJIC No. 2.80; compare *People v. Garcia* (2017) 9 Cal.App.5th 364, 378 [affirming imposition of gang enhancement because the gang

19

expert's testimony was "backed by specific evidence. In scholastically reminiscent detail, he recounted the origins of the Black P-Stones chapter in Los Angeles, making it clear how and why the gang developed to include both the Bittys and the Jungles subsets. This was significant evidence of an associational connection"], fn. omitted.)

B.     *The Questioning of Diaz Did Not Violate Defendant's Right to Confrontation*

Relying on *Douglas v. Alabama* (1965) 380 U.S. 415 (*Douglas*), and California cases applying *Douglas* (i.e., *People v. Perez* (2016) 243 Cal.App.4th 863 (*Perez*); *People v. Murillo* (2014) 231 Cal.App.4th 448 (*Murillo*); and *People v. Shipe* (1975) 49 Cal.App.3d 343 (*Shipe*)), defendant contends the trial court violated his federal constitutional right to confrontation by allowing the prosecution to pose leading questions to Diaz. Defendant's cases are distinguished from the facts here, however, and this case is more akin to precedent that rejects a similar argument for reversal.

In *Douglas*, the defendant and another man, Loyd, were charged with assault with intent to murder. (*Douglas*, *supra*, 380 U.S. at 416.) The state tried Loyd first and a jury convicted him. (*Ibid.*) The prosecutor called Loyd as a witness at the defendant's trial, but he asserted a right against self-incrimination and refused to answer questions about the incident. (*Ibid.*) "Under the guise of cross-examination to refresh Loyd's recollection, the [prosecutor] purported to read from [a statement Loyd made earlier to the police], pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?' Each time, Loyd asserted the privilege and refused to answer, but

20

the [prosecutor] continued this form of questioning until the entire document had been read." (*Id.* at 416-417, fn. omitted.) The statements the prosecutor read from the document "recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the [defendant] as the person who fired the shotgun blast which wounded the victim." (*Id.* at 417, fn. omitted.) The prosecution later "called three law enforcement officers who identified the document [from which the prosecutor read] as . . . a confession made and signed by Loyd." (*Ibid.*)

The United States Supreme Court reversed the defendant's conviction. It held his inability to cross-examine Loyd about the alleged confession denied him "the right of cross-examination secured by the Confrontation Clause." (*Douglas*, *supra*, 380 U.S. at 419.) As the high court explained, "Loyd's alleged statement that the [defendant] fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of [defendant's] act and of the requisite intent to murder. Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." (*Ibid.*)

The facts of *Douglas* and the related California decisions upon which defendant relies are different from the facts of this case. In those cases, the pertinent questions and answers were not stricken. (*Douglas*, *supra*, 380 U.S. at 416-417; *Perez*, *supra*,

21

243 Cal.App.4th at 884-885; *Murillo*, *supra*, 231 Cal.App.4th at 451-453; *Shipe*, *supra*, 49 Cal.App.3d at 346-349.) Here, by contrast, the trial court struck the substance of the questions posed to Diaz and instructed the jury not to consider the prosecution's questions as evidence. That is an important distinction because "[t]he assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6; accord, *People v. Smithey* (1999) 20 Cal.4th 936, 962 [distinguishing *Douglas* and holding the defendant was not denied his right to confrontation because the jury was instructed to disregard all questions regarding defendant's intent and any answers that may have been given].)

In addition, in *Douglas* and the other cases upon which defendant relies, there was no significant independent evidence of guilt other than what was brought out by the challenged questioning. (*Douglas*, *supra*, 380 U.S. at 419 ["Loyd's alleged statement that the [defendant] fired the shotgun constituted the only direct evidence that he had done so"]; *Murillo*, *supra*, 231 Cal.App.4th at 456 ["[T]he independent evidence of Murillo's guilt was not strong"]; *Shipe*, *supra*, 49 Cal.App.3d at 355 ["The evidence of appellant's guilt was entirely circumstantial and the prosecutor, through the guise of cross-examination, succeeded in getting before the jury a vivid picture of what he believed actually occurred on the night of the murder. He also succeeded in creating the distinct impression that [the recalcitrant witnesses] had talked to the authorities, that they described the events vividly depicted in the prosecutor's questions and that their statements were true. It stretches the imagination to believe that the prosecutor's questions did not influence the

22

verdict"].) Here, the jury was presented with better independent proof that defendant murdered Sambrano: Pereira testified he saw defendant (a person with whom he was previously familiar) confront and then shoot Sambrano. He identified defendant as the shooter during trial and earlier in a photographic line up. Diaz's testimony, in other words, was not the "crucial link" in the proof of defendant's guilt. (*Douglas*, *supra*, at 419.)

Furthermore, the prosecution's questioning of Diaz was more circumscribed than the questioning at issue in *Douglas* or the other cases relied on by defendant. Here, the document memorializing Diaz's statement to police was not read to the jury by the prosecution and the questions posed to Diaz were relatively few in number and did not pertain solely to his interview with law enforcement. (Compare *Perez*, *supra*, 243 Cal.App.4th at 884-885 [prosecution asked the recalcitrant witness "numerous questions about the statements he had made to police"]; *Murillo*, *supra*, 231 Cal.App.4th at 456 [the prosecutor asked the recalcitrant witness "over 100 leading questions" while reading the witness's police interviews].)

Thus, the facts here are not comparable to the cases on which defendant relies, and the circumstances we confront are instead closer to those found in *People v. Morgain* (2009) 177 Cal.App.4th 454 (*Morgain*). That case holds a defendant's right to confrontation was not violated by questions posed to a recalcitrant witness who was granted use immunity and ordered to testify, but refused to answer a handful of questions posed by the prosecutor, including whether the defendant told her he shot the victim. (*Id.* at 459-462.) The trial court in *Morgain*, like the trial court here, granted the defense's motion to strike all of the witness's testimony and instructed the jury not to consider the

23

prosecution's questions as evidence, but the court permitted the prosecutor to argue to the jury that the witness's refusal to testify was done to protect the defendant. (*Id.* at 462, 465.) Just as here, the questions posed to the recalcitrant witness in *Morgain* "were not the 'only direct evidence'" that the defendant shot the victim because other witnesses testified they saw the defendant shoot the victim. (*Id.* at 465-466.) The *Morgain* court held that because the trial court struck the witness's testimony and instructed the jury not to consider the prosecution's questions as evidence, and because there was independent evidence of defendant's guilt, *Douglas* did not apply and the defendant was not denied his right of confrontation. (*Id.* at 466.) The same result should obtain here.

> C.    *The Trial Court's Rulings Regarding the Defense*
> *Video Expert Do Not Warrant Reversal*
> 1.    *Cross-examination of the expert concerning*
> *proceedings in another case*

As already recounted in greater detail, the trial court permitted the prosecution to cross-examine the defense video expert Jones about his involvement in video exhibit preparation in another case that the judge overseeing the case apparently thought would be misleading. We review a trial court's ruling on the permissible bounds of cross-examination for abuse of discretion (*People v. DeHoyos* (2013) 57 Cal.4th 79, 122-123 (*DeHoyos*)) and hold there was no such abuse here. There is good authority that an expert can appropriately be examined on his or her work in other cases because that may be relevant to a jury's determination of the expert's care and reliability. (See, e.g., *People v. Shazier* (2014) 60 Cal.4th 109, 136-137; *DeHoyos*, *supra*,

24

at 123.)  That is what occurred here.  We are unpersuaded by defendant's contention that the cross-examination was allowed to exceed permissible bounds because the jury was effectively told that Jones was untruthful in the prior case.  There was no such finding by the judge in the other case; at most, Jones was criticized there for his work with counsel in preparing a video exhibit, and that could appropriately have some bearing on consideration of how thorough (or objective) his work in this case was.

### 2. *Assertedly asymmetric evidentiary rulings*

Defendant maintains the trial court violated his due process rights by applying the rules of evidence asymmetrically to the parties—allowing the detective, but not the defense's video expert, to interpret video surveillance evidence.[9]  Defendant claims the error was prejudicial because the video recordings were "critical to the defense theory of the case: [defendant] attempted to show with the video clips to which [Jones] testified that [defendant] could not have been the shooter."  Defendant's assertion of prejudice is unpersuasive.

The erroneous admission of evidence does not warrant reversal unless the error is prejudicial.  (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).)  To establish prejudice arising from

---

[9]     We reject the Attorney General's claim that defendant forfeited his asymmetrical application challenge.  During the preliminary hearing on Jones's testimony, defense counsel repeatedly argued Jones should be accorded the same latitude as the testifying detective with regard to interpreting the surveillance videos.

25

evidence improperly admitted under state evidentiary rules, a defendant must show, considering the record as a whole, that "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *People v. Benavides* (2005) 35 Cal.4th 69, 91 [*Watson* standard ordinarily governs review of errors in applying state evidentiary rules].)  Where the erroneous admission of evidence amounts to federal constitutional error, reversal is required unless the reviewing court is convinced the error was "harmless beyond a reasonable doubt."  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see also *People v. Sanchez* (2016) 63 Cal.4th 665, 698-699 [applying harmless beyond a reasonable doubt standard to admission of case-specific testimonial hearsay].)

Assuming the court's rulings on the defense objections were erroneous, they do not require a reversal of defendant's convictions no matter whether we apply the *Watson* or *Chapman* standard.  Jones's videos were shown to the jury, both during his direct examination and later during the defense's closing argument, and defense counsel had free reign when using Jones's video to argue during closing that defendant was not the shooter. With the jury as the ultimate judge of what the video footage did or did not show when offered by either side, we are confident the argument by defense counsel about what was depicted on the video and its significance means the absence of some measure of largely if not entirely duplicative testimony from Jones did not contribute to the verdict obtained—particularly in light of testimony from Pereira who said he recognized defendant as soon as he stepped from the vehicle, having seen him in the neighborhood over a period of years.

*D.      Defendant Forfeited His Claim That Pereira's "Sad"*
*Statement Was Improper Victim Impact Testimony*

Defendant argues the trial court erred by overruling his counsel's objection to the prosecutor's question asking Pereira how the photograph of Sambrano's body affected him because the question sought victim impact testimony.  Victim impact evidence relates to "the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." (*Payne v. Tennessee* (1991) 501 U.S. 808, 817; accord, *People v. Vance* (2010) 188 Cal.App.4th 1182, 1199.)  Such evidence "may include the effects on the victim's friends, coworkers, and the community." (*People v. Brady* (2010) 50 Cal.4th 547, 578.)  A prosecutor's introduction of victim-impact testimony is "impermissible" during the guilt phase of a trial. (*People v. Salcido* (2008) 44 Cal.4th 93, 150-151 [holding wife's testimony regarding last time she saw her husband, the victim, was not victim-impact evidence because it "scarcely touched upon the victim's family life and did not relate the effect of defendant's acts upon family members"].)

"Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)  "To satisfy Evidence Code section 353, subdivision (a), the objection . . . must be both timely *and* specific as to its ground.  An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or

27

incorrect grounds (e.g., 'relevance') and revise the objection later . . . stating specific or different grounds." (*Id.* at 22; see also *People v. Abel* (2012) 53 Cal.4th 891, 924 ["If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial"].)

At trial, defense counsel did not object to the question of how the photograph of Sambrano's body affected Pereira on relevancy grounds or on grounds it sought unduly prejudicial information. Instead, the objection was that the photograph shown to the witness "assumed facts not in evidence." That did not reasonably or fairly alert the prosecution or the trial court to defendant's present contention that the question sought testimony which would encourage the jurors to "render a decision based on sympathy and emotions untethered to the facts of the case." The victim impact evidence argument made now on appeal is therefore forfeited.

### E. There Is No Cumulative Error Warranting Reversal

Defendant contends that even if the errors at his trial did not prejudice him when considered individually, their cumulative effect deprived him of due process and a fair trial. We have reversed the jury's true finding on the gang enhancements, but that has no bearing on defendant's other challenges to his convictions. And as to those, we have not held there was any error—we assumed error as to the evidentiary ruling concerning the video footage testimony but held there was no prejudice. Defendant's cumulative error contention is accordingly meritless.

28

(*People v. Edwards* (2013) 57 Cal.4th 658, 767; accord, *People v. Woods* (2015) 241 Cal.App.4th 461, 489.)

## DISPOSITION

The true findings on the section 186.22, subdivision (b)(1) enhancements attached to counts 2 and 3 are reversed, defendant's sentence is vacated, and the matter is remanded to the trial court for resentencing without any application of those enhancements.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

KIM, J.