Filed 10/2/24  P. v. Pope CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098146 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE004639) |
| v. | |
| WILLIE JAMES POPE III, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Willie James Pope III guilty of the attempted murder and carjacking of victim K.M.  In a bifurcated bench trial, the trial court found true that defendant had two prior convictions for crimes which qualified as strikes under Penal Code sections 667, subdivision (e)(2), and 1170.12, subdivision (c), and as serious felonies under Penal Code section 667, subdivision (a).  (Undesignated section references

1

are to the Penal Code unless otherwise noted.)  The trial court sentenced the defendant to a determinate term of 9 years and an indeterminate term of 27 years.

In the trial court, defendant was represented by attorney Alexander Asterlin (Asterlin) except during certain proceedings at which defendant represented himself.

On appeal, defendant raises four arguments.  First, he argues that the trial court erred in denying the third of three motions he brought to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).  Second, he argues that the judgment must be reversed because his trial counsel's performance was so deficient that he was constructively deprived of his right to the effective assistance of counsel under the United States Constitution and the California Constitution.  He argues we should presume that counsel's performance was prejudicial per se and that, therefore, he need not meet the general requirement to prove prejudice to prevail on this issue on appeal.  Third, defendant argues the trial court erred in denying a motion for mistrial brought by his counsel during the trial.  As to this, we note that although on appeal defendant treats the subject motion as a motion for mistrial, in the trial court Asterlin referred to his request as one for a new trial.  We will treat it as a motion for mistrial here and disagree with defendant's argument that the trial court erred in denying the motion.  Fourth and finally, defendant argues his sentence is illegal under section 1385, subdivision (c)(2)(B) and (C).

We affirm the judgment.

### FACTS AND HISTORY OF THE PROCEEDINGS

The People presented the following evidence at trial.  The defense did not call any witnesses.

#### Testimony of K.M.

K.M., the victim, testified that the morning of November 8, 2020, she stopped at a gas station located at El Camino and Northgate Boulevard in Sacramento to put air in the tire of her Mercedes automobile.  As she waited in line at the station, defendant

2

approached her and asked her for a ride. She did not know the defendant. K.M. said "no" to defendant's request for a ride, but she changed her mind because defendant looked "defeated" and "sad almost." Defendant wore a hat and a black jacket, and he was carrying a black bag. At trial, K.M. identified the jacket defendant was wearing. K.M. testified that still images she was asked about, showed the defendant getting into her car.

Defendant told K.M. to drive south, but he did not give her a specific address. They drove around for some time, eventually switching their direction from south to north. As K.M. drove, defendant sent text messages on his mobile phone and made and received calls.

At one point, defendant mentioned he had wrecked his car and said something about making a drug delivery. This did not alarm K.M., because she uses crystal methamphetamine. She probably drank some alcohol that morning and had used crystal methamphetamine the night before.

Eventually, defendant directed K.M. to leave the freeway, and after driving a few blocks, they stopped in a park for 10 to 20 minutes, where defendant continued to make calls and text messages.

When K.M. told defendant she needed to go, he asked her to drive him a few more blocks, which she did. They stopped in a residential area. Defendant received a text message, then he told K.M. he needed her car. K.M. told defendant she would not give him the car.

Defendant pulled out a knife and repeated he needed K.M.'s car. He told K.M. to not make him pull out a gun. K.M. told defendant he did not need to pull out a gun, and she would give him the car.

K.M. started to get out of the car but struggled with her seatbelt. Defendant leaned over to help open the door, then he stabbed K.M. in the stomach. K.M. told defendant to stop and he didn't need to stab her. Defendant leaned over and opened the door, and

3

K.M. was able to release her seatbelt. Defendant then stabbed K.M. in the chest and pushed her out of the car. K.M. testified she "was stabbed in [her] chest. It was a direct hit to [her] heart."

As K.M. fell from the car she grabbed her purse and cell phone and defendant drove off.

K.M. looked for help and called 9-1-1 on her cell phone. The call was played for the jury. She told the dispatcher she had been stabbed five times. She testified defendant had tried to stab her more than the two times, leaving a mark on her right wrist and below her right breast.

Paramedics arrived and took K.M. to UC Davis Medical Center, where she received open heart and exploratory surgery.

Testimony of Responding Officers

Officers who responded to K.M.'s 9-1-1 call testified they went to 7752 40th Avenue on November 8, 2020, at approximately 11 a.m.

One of the officers found K.M. leaning against a building, with a stab wound to her chest and one to her lower abdomen. The other followed a trail of fresh blood on the road, and looked for witnesses and videos of the incident. He found a video that shows K.M. falling out of the car and going to find help and her Mercedes driving away.

Detective Cannedy First Direct Examination

When Detective Derrick Cannedy was first called as a witness, he testified as follows:

He identified still photos from a surveillance video camera at the gas station where K.M. picked up defendant. Detective Cannedy was unable to collect the surveillance video itself because it had been written over and was no longer available when he tried to get it.

On November 20, 2020, Detective Cannedy was told that K.M.'s car had been found in Contra Costa County and it was then towed to Sacramento.

Detective Cannedy searched the car in December 2020. He found clothing that appeared to be the same clothing the suspect was wearing in the still shots from the gas station, including a jacket. He also found a black duffle bag with men's clothing. Detective Cannedy also found paperwork in the car including one piece of paper that listed "Willie Pope" and a phone number. The paper also showed a unique government-issued identification number.

Using the name on the paperwork and the government identification number, Detective Cannedy found a Willie Pope, Jr., a birthday for that person, and a photo. He thought the person in the photo resembled the person in the surveillance stills.

Detective Cannedy obtained a search warrant for data related to the phone number on the paperwork which he served on Metro PCS. From that he received a spreadsheet that listed date, time, and identifying location information for the associated phone's use. He also received subscriber information that identified the subscriber as "Woolie Pop."

In March 2021, Detective Cannedy was told defendant had been taken into custody in Florida. Extradited, defendant arrived in Sacramento on March 30, 2021. Detective Cannedy showed defendant the gas station still photos, and defendant identified himself as the man in the photos.

### Deputy Patrick Webb

Deputy Sheriff Patrick Webb testified he was employed as a Deputy in the County of Contra Costa Sheriff's Department. He was on patrol in the early morning hours of November 20, 2020, when, at 2:36 a.m., he received notification that there had been an automated license plate reader hit for a car that had been involved in an armed carjacking. He found the car in San Pablo and it matched the description of K.M.'s car, including the license plate number shown in the still photos from the gas station. Deputy Webb saw the

5

Mercedes and followed it as it left the freeway in Richmond. Continuing to follow the car, he turned on his patrol car identifying lights at which point the Mercedes began moving at a high rate of speed.

Deputy Webb was able to see the driver and gave a physical description of the person he saw. Although it was dark outside, Deputy Webb could see the driver because when the driver turned left, he would turn in front of Deputy Webb's patrol vehicle, and the patrol car's headlights were positioned so that Deputy Webb could see in the driver's side window. The driver was wearing a blue baseball cap.

At trial Deputy Webb looked at the still photos from the gas station and believed the hat he saw the driver wearing was "consistent" with the hat in those photos.

Deputy Webb continued to chase the Mercedes, but he paused the pursuit when the vehicle was traveling at a high speed on San Pablo Dam Road. When Deputy Webb resumed his pursuit, he found the vehicle crashed on a sidewalk at the intersection of Valley View Road and San Pablo Dam Road. The driver was not with the vehicle, and Deputy Webb was unable to locate the driver.

Deputy Webb was not able to identify the defendant as the person he saw driving the car.

### Redirect of Detective Cannedy

When the People recalled Detective Cannedy, he testified that he had found the jacket marked as Exhibit 13 in a large trash bag in the recovered Mercedes.

Detective Cannedy also reviewed photos contained in a report Deputy Webb had prepared and Detective Cannedy recognized the photos as showing K.M.'s Mercedes. Detective Cannedy said the condition of the car in the photos was consistent with its condition when he received it.

### Dr. Rachel Russo

Dr. Rachel Russo testified she is a trauma surgeon who works at UC Davis Medical Center.  She operated on K.M. on November 8, 2020.  She repaired an injury to K.M.'s heart, and found injuries to K.M.'s lung and liver.  Had surgeons not treated K.M.'s injuries, she would have died.

### Daniel Garbutt

Daniel Garbutt testified as an expert on call records and geolocation analysis.

He reviewed the cell phone data relating to the phone number registered to "Woolie Pop," which Detective Cannedy had identified as a number associated with the defendant.  Garbutt created a Google map overlay that tracked the cell phone data and showed where the phone traveled on November 8, 2020, based on the cell towers to which the phone connected.

The data shows that on November 8, 2020, the phone traveled the approximate path K.M. described in her testimony, beginning at the gas station between 8:33 a.m. and 9:35 a.m., winding up near where K.M. was found on 40th Avenue between 10:49 and 11:12 a.m., and traveling a fairly significant distance to connect to another tower in the Vacaville area by 12:53 p.m.

Garbutt also analyzed data from November 20, 2020.  He created exhibits with this data that were published to the jury and admitted.  The data shows a call made at 8:20 a.m. near where Deputy Webb found the crashed Mercedes.

### Conviction and Sentence

Much of the procedural background that is central to the issues defendant raises in this appeal will be described in the discussion.

The People charged defendant with two counts.  Count one accused the defendant of the attempted murder of K.M., in violation of sections 187, subdivision (a), and 664.  The operative information further alleged as an enhancement that when the defendant

7

committed count one, he personally used a deadly and dangerous weapon, a knife, within the meaning of section 12022, subdivision (b)(1), causing the offense to be a serious felony within the meaning of section 1192.7, subdivision (c)(23).

Count two accused the defendant of carjacking in violation of section 215, subdivision (a). It was further alleged as an enhancement that when the defendant committed count two, he personally used a dangerous and deadly weapon, a knife, and that given the alleged crime was a carjacking, if convicted, the use of the knife would come within the provisions of section 12022, subdivision (b)(2).

Both counts included an enhancement allegation that the defendant personally inflicted great bodily injury upon K.M., who was not an accomplice to the offense, within the meaning of section 12022.7, subdivision (a), causing the felony to be a serious felony within the meaning of section 1192.7, subdivision (c)(8).

The information alleged various factors in aggravation under section 1170 and California Rules of Court, rule 4.421.

The information also alleged that the defendant had two prior convictions that were (1) serious and violent felonies that made him eligible for a three-strikes sentence within the meaning of sections 667, subdivision (e)(2), and 1170.12, subdivision (c)(2); and (2) serious felonies within the meaning of section 667, subdivision (a). According to the information, the two alleged prior convictions were entered in the same action in 1991.

The jury found defendant guilty on both counts, and it found the included enhancement allegations were true.

With respect to both counts, the jury found true various factors in aggravation identified in California Rules of Court, rule 4.421(a), which identifies factors related to the crime of which a defendant is convicted—e.g., whether the defendant was armed during the commission of the crime. However, the jury found not true the allegation that the manner by which defendant carried out the crimes alleged indicated planning,

sophistication, or professionalism within the meaning of California Rules of Court, rule 4.421(a)(8).

The trial court held a bifurcated bench trial on the alleged prior convictions. The court found true that on July 30, 1991, defendant was convicted of two violent crimes both of which would bring him within the three-strikes law as set forth in sections 667, subdivision (e)(2), and 1170.12, subdivision (c). It also found the prior convictions qualified as serious felonies qualifying defendant for an additional five-year sentence under section 667, subdivision (a).

During the bifurcated trial, the court also found true various factors in aggravation identified in California Rules of Court, rule 4.421(b). One of the factors in aggravation alleged and found to be true was that the defendant has engaged in violent conduct indicating a serious danger to society within the meaning of California Rules of Court, rule 4.421(b)(1).

The trial court sentenced defendant to 27 years to life for attempted murder, taking the upper term for attempted murder of nine years, and multiplying it by three under the three strikes law. In explaining why it selected the upper term, the court listed various factors in aggravation, including that the defendant has engaged in violent conduct indicating a serious danger to society.

The court also imposed an additional one-year consecutive determinate term for the use of a knife (section 12022, subdivision (b)(1)), an additional three year consecutive determinate term for great bodily injury (section 12022.7, subdivision (a)) and one five year consecutive determinate term for the two prior offenses (section 667, subdivision (a)). Because those offenses originated under the same docket number, only one five-year term could be imposed. In sum, the trial court imposed a 9-year determinate term and a 27-year indeterminate term.

The trial court stayed the sentence on the carjacking count, count two, under section 654. It calculated the stayed sentence as having an indeterminate term of 27 years

to life for the section 215 offense, using the upper term of 9 years and multiplying it by 3. The trial court then added an additional determinate term of 11 years for the various enhancements. The 11 years includes 3 years for the section 12022, subdivision (b)(2), enhancement; 3 years for the section 12022.7, subdivision (a), enhancement; and 5 years for one of the two concurrently entered prior serious felony convictions under section 667, subdivision (a).

The court awarded the defendant 785 days of presentence credits. It imposed various fines and fees.

## DISCUSSION

### I

### *Denial of Defendant's <u>Faretta</u> Motion*

Defendant argues that the trial court erred when it denied a July 22, 2022, motion he made to represent himself under *Faretta, supra,* 422 U.S. 806. He claims this alleged error violated his rights under the Sixth and Fourteenth Amendments of the United States Constitution.

### A. <u>Additional</u> <u>Background</u>

#### 1. <u>Proceedings</u> <u>Prior</u> <u>to</u> <u>the</u> <u>First</u> <u>*Faretta*</u> <u>Motion</u> <u>in</u> <u>December</u> <u>2021</u>

Prior to the preliminary hearing in this matter, Asterlin was appointed as counsel for defendant.

Asterlin made appearances at scheduled preliminary hearing dates on August 24, October 27, and December 1, 2021. The August 24, and October 27, 2021, preliminary hearing dates were continued.

At the December 1, 2021, preliminary hearing, the People and Asterlin stated they were ready to proceed with the preliminary hearing. Asterlin stated defendant wished to continue the hearing, though Asterlin could see no legal cause to do so.

10

Defendant asked to address the court directly. Defendant stated he wanted to represent himself. The court asked defendant various questions regarding his education and understanding of the law and criminal proceedings, explained the seriousness of the charges defendant was facing, and explained the various risks and responsibilities attendant with representing oneself in court. The court granted defendant's request.

Asterlin agreed to give the items of discovery he had received to a pro. per. coordinator. The court relieved Asterlin as counsel of record. Asterlin advised that if defendant elected to have counsel after the preliminary hearing, the panel would reassign the same attorney.

Defendant said that as of that date he had not received any of the discovery in the case. He stated there were "a lot of people that I need to contact which are witnesses for me, and the simple things that I asked for, I received nothing." The prosecutor listed various documents she had provided to the previously-assigned assistant public defender, and she stated she believed all those materials had been turned over to Asterlin, who would turn them over to the pro. per. coordinator to give to defendant.

Defendant sought a continuance of at least 30 days to review the materials. The court continued the hearing by 28 days.

### 2. Proceedings Up to the *Faretta* Waiver in April 2022

Between December 1, 2021, and April 8, 2022, there were various hearings scheduled on discovery issues and the preliminary hearing was continued.

At a March 17, 2022, preliminary hearing date, defendant asked for a continuance. His primary reason for requesting the continuance was that—due to limitations with the computers in the jail's law library—he had not been able to access and view thousands of pages of cell phone records the People had provided. The investigator who had been assigned to assist defendant confirmed his claims as to the need for a delay.

11

The court continued the matter to April 8, 2022. In ordering the continuance, the court stated it was satisfied the discovery had been turned over, and it was only continuing the hearing to resolve the document access issue.

### 3. Revocation of the *Faretta* Waiver in April 2022

The parties appeared before the Honorable Russell L. Hom on April 8, 2022. The People declared they were ready to proceed with the preliminary hearing.

Defendant expressed his continued belief that the People had not provided him all the discovery to which he was entitled, and he complained that discovery provided to him was given in a form he could not access. He stated he had a motion to compel scheduled for April 14, 2022.

Defendant said, "right now because of not having any of my materials and being in court too I'm gonna ask for counsel, man. I'm requesting counsel now. . . . I don't have nothing. . . . I'm being expected to be able to go proceed with this preliminary with a flash drive that I can't even view and nobody sees nothing wrong with that."

The court told defendant he had the right to request counsel, and defendant said "[t]hat's what I'm requesting . . . ."

The court said to the defendant, "you have the right to request appointment of counsel, if that's what you're requesting. However, you should recognize though that you can't just keep going back and forth." Defendant responded, "[n]o, I understand that."

The court continued, "[i]f I reappoint counsel for you, . . . you have an attorney representing you and in the future if you then discharge counsel, which you'd have the right to do, you can't then come back in and then expect necessarily that the Court would then automatically grant reappointment of counsel." Defendant responded, "[n]o, I get that."

When the court asked the People for their position on appointing counsel, the prosecutor responded, "[a]t this point, Your Honor, the People feel like this is [a] delay tactic; however, I would submit to the Court on the issue."  The court observed there was no record at that point of defendant going pro. per., requesting counsel, then going pro. per. again.  The People agreed but noted that the defense had been ready to proceed with the preliminary hearing when defendant had previously decided to make a *Faretta* motion, then seek a continuance.

Defendant interjected that he had elected to go pro. per. before "only . . . because the attorney I had was not representing me, right?"  He said, "I didn't want to represent myself.  If I had effective counsel, I wouldn't have never even went here."

The court and the People both explained that there was a possibility that defendant's previous attorney would be reappointed.  The court explained that defendant would not be able to pick his appointed counsel if he revoked his *Faretta* waiver.  Defendant responded, "I just want it to be anybody but Asterlin . . . ."

The court said, "I just want you to understand the perimeters of what will be taking place here.  [¶]  If, in fact, you are requesting appointment of counsel, I will appoint counsel for you, right?  But you can't then get counsel, drop counsel and get counsel back.  It may not happen, right?"  The court also said, "you have the absolute right to represent yourself in this matter, you've exercised that right in the past, and at this point is it your request . . . to waive your right of self-representation and seek appointment of counsel . . . ?"  Defendant confirmed his request.

The court then said it would appoint counsel, and told defendant, "you should be advised that it may well be Mr. Asterlin, you will have to resolve those issues . . . ."  Defendant said, "I just want to make it clear that I'm willing to go through whatever measures it is to make sure that this man can't represent me so we—we can't even talk, we don't get along."  Defendant described him and Asterlin as "literally like enemies."

The court explained to defendant that it would be up to the panel who represents him, and it was "not making any representations in terms of who should or should not represent" him. The defendant said he understood.

The court then set an April 22, 2022, hearing date for defendant's discovery motion and to confirm an attorney had been appointed, and a May 23, 2022, preliminary hearing date.

### 4. Reappointment of Counsel and Hearings in April and May 2022

At the April 22, 2022, hearing, Asterlin was reappointed to represent the defendant. On May 23, 2022, the court continued the preliminary hearing and a discovery motion to July 12, 2022. The minutes from the April and May 2022 hearings contain no indication that defendant sought to bring either a *Faretta* motion or a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, to substitute counsel at those hearings.

### 5. July 12, 2022, *Marsden* and *Faretta* Motions, and Preliminary Hearing

The case came forward for a preliminary hearing on July 12, 2022, before the Honorable Patrick Marlette.

Asterlin began by requesting a security hearing so defendant could be restrained, because defendant had threatened to harm Asterlin and his family.

Asterlin stated that the defendant wished to make a *Marsden* motion and, if that was not successful, to again represent himself.

Asterlin stated he was ready if the court wanted to proceed with the preliminary hearing.

Defendant said he had no intention of threatening anyone and claimed to have always behaved "in a gentlemanly manner." He claimed Asterlin had not done any work on his case, the two did not see "eye to eye" on the case, and that the only thing he had spoken with Asterlin about was the fact that they don't see eye to eye on the case.

14

The court found no reason to dispute Asterlin's representations regarding his safety concerns and agreed to have the defendant restrained for the hearing.

The court began the *Marsden* hearing by asking defendant to identify his most pressing issue with Asterlin. Defendant said Asterlin was denying him the right to participate in his defense, that he had no idea what was going on in the case, and that Asterlin had refused to speak with people who defendant believed would help his case. Defendant said Asterlin had blocked the efforts of one of defendant's friends trying to retain other counsel for him and prevented the investigator defendant had while he was pro. per. from speaking with him.

Asterlin explained that defendant's theory of the defense was not a practical one. Asterlin said he was prepared to represent the defendant.

Asterlin said defendant had told him several times he was going to get Asterlin off the case, and defendant believed he was entitled to the lawyer he wanted on the case. Asterlin said he believed defendant's prior use of a *Faretta* motion was a "tactic to lawyer shop." He stated defendant had gone so far as to threaten to kill Asterlin and his family.

The court asked questions about the history of defendant's representation, and Asterlin explained defendant made the December 2021 *Faretta* motion at the preliminary hearing, when Asterlin had been ready to proceed.

The *Marsden* hearing spiraled downward from there, with defendant seeming to claim Asterlin was not explaining everything correctly.

Defendant accused the court of "not giving [him] a chance," and eventually the court told defendant it might need to remove him from the courtroom and send him to another department to listen.

The court then said, "I'm going to find right now that Mr. Pope is being disruptive and not submitting himself to the process. [¶] Mr. Pope, I'm going to remand you to a different courtroom, where you will hear this on Zoom."

15

Defendant stated he would just leave and wanted to go back to jail, and he alleged the hearing was "one sided." The court declared that the hearing on the *Marsden* motion was over.

The court then went back on the open record for the preliminary hearing.

The court stated that defendant had become disruptive once it became clear the court was going to deny his *Marsden* motion, and that defendant had kept speaking over the court. The court stated it denied the *Marsden* motion.

The court added, "to the extent it was a *Faretta* motion, [defendant] has demonstrated that he is not willing to abide by the procedures of the court, so I will find that he is not a proper subject . . . to represent himself."

The court stated it had moved defendant to another courtroom where he would be able to watch the proceedings by Zoom.

The court took a recess, and when it returned it noted that defendant had been complaining of chest pains, and the court sent defendant to emergency medical technicians (EMTs) to be checked, and it would determine later if the preliminary hearing could proceed. Later, when the court returned on the record for an afternoon hearing, it noted EMTs had examined defendant and advised defendant was not having a heart attack—he was not perspiring, shaking, or making outward indications of pain. But, the court noted, the EMTs had said under protocol they could not clear defendant without a doctor.

The court declared that defendant had "voluntarily absented himself from this proceeding," stating that "a reviewing court can look at the record in this case and see that his intention is to delay the proceedings." The court ruled it would proceed with the preliminary hearing without defendant. Neither Asterlin nor the People quarreled with the court's decision to decide defendant had voluntarily absented himself. The court said, "[i]n case it's not clear, I am finding that [defendant] is willfully interfering with the process of the court."

16

The court then went forward with the preliminary hearing. The court found there was sufficient cause to find defendant guilty and deemed the complaint an information. The court set a second arraignment for July 22, 2022.

### 6. July 22, 2022, *Faretta* and *Marsden* Motions, and Second Arraignment

On July 22, 2022, the matter came before the Honorable Carlton Davis.

The defense waived reading of the information, and counsel and the court discussed possible dates for a trial readiness conference and trial.

Defendant asked the court if he could speak for himself.

Defendant asked to invoke his *Faretta* rights. He claimed the only reason he had asked for counsel to be reappointed was he was going to go in for surgery. He said he "put off [his] surgery so that [he could] go pro. per." He said that he and Asterlin "cannot even talk. He had me chained up like I was a slave."

The People explained a *Faretta* motion had previously been granted and argued defendant had used the *Faretta* in addition to other tactics to delay the case. The People also stated that defendant had made a *Faretta* at the July 12, 2022, preliminary hearing, which Judge Marlett denied. The People objected "to these continued tactics" to delay the trial.

The court then confirmed the history of defendant's use of *Faretta* motions with the court clerk.

The court said to defendant, "it appears you already got a *Faretta* granted. You withdrew it for whatever reason. . . . I would say most judges make it clear to a person once you get *Faretta*, you can't play games with it and go back and forth and say I want the *Faretta*, now I'm going to withdraw the *Faretta* and give it back to me again because it delays the process. So I'm going to deny the *Faretta* without prejudice." The court added, "I think the best thing is to go back to Judge Hom, who is the person that originally—who seems like he has the most information about it. So the *Faretta* is going

to be denied in light of the fact that you just withdrew the *Faretta* in . . . April, and now you're asking for it again.  That's denied."  Thus, the trial court concluded the July 22, 2022, *Faretta* motion was part of a series of motions brought by defendant to delay the trial and disrupt the proceedings.  This is the ruling defendant is challenging with this appeal.

A discussion regarding the defense's receipt of discovery documents then followed, during which defendant repeatedly interrupted the court and accused Asterlin of lying about receiving everything.  He alleged Asterlin and the People were "tag-teaming" him and referred to the process as "a modern-day lynching."

Defendant said, "I'm not going to come in front of your court no more asking for no *Faretta*.  All I'm asking you to do is take this racist ass motherfucker off my damn thing.  I'm speaking what it is, bro."  The court then told defendant he could not curse in court, and it tried to explain its reasoning to defendant, who kept interrupting.

The court then proposed they hold another *Marsden* hearing and cleared the courtroom of representatives of the People.

At the *Marsden* hearing, defendant said what had changed between then and the prior *Marsden* hearing was that (1) Asterlin tried to make defendant look violent when defendant had never threatened Asterlin; and (2) defendant was getting attacked in jail by two other detainees Asterlin also represented.

Asterlin stated his clients do not know about one another unless inmates discuss their representation amongst themselves.  He represented he was in good professional standing.  Asterlin provided a rough outline of his theory for the defense.

The court denied the *Marsden* motion.  Three times while the court explained its ruling, it admonished defendant to "let me finish."

After the *Marsden* hearing, the court went back on the record with the People present, and it set dates for trial readiness conference and trial.

18

B.  Right to Self-Representation and Standard of Review

### 1. *Faretta* Motions and Reasons to Grant or Deny

" 'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.  A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution.  [Citations.]  At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.  (*Faretta*[,] *supra*, 422 U.S. [819] . . . .' (*People v. Marshall* (1997) 15 Cal. 4th 1, 20 [(*Marshall*)].)" (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1202-1203.)

"A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently." (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*).)

A court may deny a defendant's *Faretta* motion based on evidence that a defendant's purpose in bringing the motion is to delay proceedings.  (*Marshall, supra,* 15 Cal.4th at p. 26; accord *People v. Johnson* (2019) 8 Cal.5th 475, 502 (*Johnson*); *Lynch*, *supra*, 50 Cal.4th at pp. 721-722; *People v. Butler* (2009) 47 Cal.4th 814, 825 (*Butler*); see also *People v. Gomez* (2018) 6 Cal.5th 243, 271 (*Gomez*) ["a trial court may directly deny a *Faretta* request when it is designed 'to frustrate the orderly administration of justice' "].)

Further, a court may deny a *Faretta* motion when a defendant's conduct prior to the *Faretta* motion "gives the trial court a reasonable basis for believing that his self-representation will create disruption." (See *People v. Welch* (1999) 20 Cal.4th 701, 734 (*Welch*).)

19

The erroneous denial of a *Faretta* motion is reversible per se. (*People v. Best* (2020) 49 Cal.App.5th 747, 756 (*Best*).)

### 2. Standard of Review

Defendant suggests we must review the trial court's denial of his *Faretta* motion de novo, because the motion was timely made. In contrast, the People claim a "trial court's denial of a defendant's request for self-representation is reviewed for abuse of discretion." Neither party is entirely correct.

"We review de novo, and after a review of the entire record, the question of whether the defendant's invocation of the right to self-representation and waiver of the right to counsel was knowing and voluntary. ([*Marshall, supra,*] 15 Cal.4th [at pp.] 23–24 []; *People v. Mickel* (2016) 2 Cal.5th 181, 211–212].) However, in certain circumstances, the denial of a *Faretta* motion is within the discretion of the trial court and reviewed for abuse of discretion, as when a defendant is so disruptive or disrespectful as to preclude the exercise of self-representation (*Welch, supra,* 20 Cal.4th at p. 735), or when a request for self-representation is untimely ([*Lynch, supra,*] 50 Cal.4th [at pp.] 722, 728 [])." (*Best*, *supra*, 49 Cal.App.5th at p. 756.)

Moreover, the correct standard of review when considering whether a request is equivocal and the somewhat overlapping question of whether a motion is brought to disrupt or delay proceedings is not settled. *Marshall*, *supra*, 15 Cal.4th 1, is the seminal case from which California courts derive the rule that a *Faretta* motion may be denied based on evidence that a defendant's purpose in bringing the motion is to delay proceedings. (*Id.* at p. 25, *Johnson*, *supra*, 8 Cal.5th at p. 502; *Gomez*, *supra*, 6 Cal.5th at p. 271; *Lynch*, *supra*, 50 Cal.4th at pp. 721-722; *Butler*, *supra*, 47 Cal.4th at p. 825.) In *Marshall*, our Supreme Court considered whether a defendant's request to represent himself was equivocal. (*Marshall*, *supra*, 15 Cal.4th at p. 24.) With respect to the standard of review, the Court opted not to settle on a definitive standard, stating, "[w]e

20

need not determine whether de novo review or substantial evidence review is appropriate, for under either standard, defendant's claim fails." (*Id.* at p. 25.)

We note that here the trial court made no specific finding regarding whether the July 22, 2022, *Faretta* motion was timely. We also note that in framing the question on appeal as based on the July 22, 2022, ruling instead of the July 12, 2022, ruling, defendant is sidestepping a review of a denial that was clearly based on the trial court's well-supported finding that defendant was too disruptive to serve as his own counsel.

In any event, much like the Court did in *Marshall*, we find no error even under either standard of review.

## C. Analysis

"The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's *conduct and other words*. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's *conduct or words* reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. *A motion for self-representation* made in passing anger or frustration, an ambivalent motion, or one *made for the purpose of delay or to frustrate the orderly administration of justice may be denied*." (*Marshall*, *supra*, 15 Cal.4th at p. 23, italics added.)

This need for an unequivocal expression for self-representation is critical because, "some assertions of the right of self-representation may be a vehicle for manipulation and abuse. It is not only the stability of judgments that is at stake, however, when we require a defendant to make an unequivocal request for self-representation. The defendant's constitutional right to the effective assistance of counsel also is at stake—a right that secures the protection of many other constitutional rights as well. [Citations.] The high court has instructed that courts must draw every inference against supposing that the defendant wishes to waive the right to counsel. [Citation.] It follows, as several courts

have concluded, that in order to protect the fundamental constitutional right to counsel, one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself." (*Marshall*, *supra*, 15 Cal.4th at pp. 22-23.)

Hence, *Faretta* motions must be unequivocal to protect defendant's right to counsel and to protect the integrity of the judicial process. If an unequivocal request—both in words and conduct—were not required "defendants could plant reversible error in the record. (*Marshall*, [*supra*, 15 Cal.4th] at pp. 21, 22; accord, *People v. Valdez* (2004) 32 Cal.4th 73, 98–99 [].) Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation . . . ." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001-1002.)

Here, defendant brought his first *Faretta* motion when Asterlin declared he was ready to proceed with the preliminary hearing. Defendant then revoked his *Faretta* rights when it appeared his ability to gain continuances based on complaints about discovery had run its course. Then, he brought a series of *Marsden* and *Faretta* motions when Asterlin again declared he was ready to proceed with the preliminary hearing. When the July 12, 2022, motions failed, defendant became increasingly disruptive, said he wanted to go back to jail, and complained of chest pains when the court placed him in another courtroom and proceeded to move forward with the preliminary hearing. Then, at the second arraignment 10 days later, defendant again claimed a desire to invoke his rights for self-representation under *Faretta*. Collectively, this leads to the irrefutable conclusion that defendant's real motive in bringing the *Faretta* motion on July 22, 2022, was to again try to force a delay of the proceedings and possibly to lawyer shop. It was not a sincere desire to represent himself. (See *Johnson*, *supra*, 8 Cal.5th at pp. 501-502 [finding trial court reasonably concluded that it had a " 'strong suspicion' " defendant's *Faretta* motion, which was much like a motion he brought against a prior attorney and following

22

months of working together, was made to interrupt the trial process]; *Marshall*, *supra*, *supra*, 15 Cal.4th at p. 26 ["it appears defendant attempted to subvert the orderly administration of justice by 'juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions' [citation], along with possible efforts to mislead the court with respect to his mental competency"].)

Defendant urges us to look at Asterlin's conduct and actions during the trial, and suggests the record reveals that defendant knew there would be problems with Asterlin representing him and, therefore, his *Faretta* motions were sincere and not an effort to delay the proceedings. The record indicates otherwise.

We note here that, as will be discussed in the next section, the issues defendant raises regarding Asterlin's representation of him in his ineffective assistance of counsel claim arose after Asterlin was presented with previously undiscovered information during the trial. That is, the issues identified have little to no relation to defendant's pretrial grievances about his and Asterlin's alleged differing theories about the case before the trial began. We also note that if we were to use later incidents to judge the propriety of the trial court's ruling on the July 22, 2022, motion, we would also consider what happened when defendant made a *Marsden* motion at a sentencing hearing. The court granted the motion, said it would appoint new counsel for defendant, and continued the sentencing by two weeks believing it would be able to identify new counsel on the continued date. Then, at the next hearing date, defendant appeared with Asterlin as his *retained* counsel. This suggests that perhaps defendant's desire to be rid of Asterlin, even after the trial, was not as firm or genuine as he would have us believe, and his real concern in bringing *Marsden* and *Faretta* motions was to cause delay at critical points in the proceedings.

Finally, we consider the timing of the *Faretta* ruling defendant challenges here. It occurred a mere 10 days after the court denied another *Faretta* motion because defendant seemingly could not conduct himself appropriately in court. We have no trouble

23

concluding that the July 12, 2022, ruling could withstand the applicable abuse of discretion review.  (*Welch, supra,* 20 Cal.4th at p. 735.)  Thus, the July 22, 2022, motion—and defendant's focus on it here—is part and parcel of defendant's pattern to attempt to game the system by the use of *Faretta* and *Marsden* motions to delay and taint the proceedings.

## II

### *Ineffective Assistance of Counsel*

Defendant argues that the guilty verdicts must be reversed because Asterlin's performance at trial was so deficient that defendant was constructively deprived of his right under the United States Constitution and the California Constitution to effective assistance of counsel.  He argues that given the extent and nature of Asterlin's failures, we should presume defendant was prejudiced per se.  We disagree that Asterlin's performance was prejudicial per se.

A.  Additional Background

Here, we focus on the actions and behavior of Asterlin during trial proceedings through sentencing.

1.  October 17, 2022 Motion in Limine Re: Chain of Custody of the Car

Prior to voir dire on October 17, 2022, the trial court heard motions in limine brought by the defense.  One of the motions asked the court to exclude evidence of items found in K.M.'s car and evidence regarding how the vehicle was found.  Asterlin expressed concern that as of the time of the motion, (1) it did not appear that officers involved in the chase of the vehicle in Contra Costa County would be testifying; and (2) there was no chain-of-custody information about how the vehicle had been preserved between the time when it was found and the time Detective Cannedy searched it.

The prosecutor explained that her original plan was to have Detective Cannedy testify that he had been notified by Contra Costa County that the car had been recovered

24

there. She had not planned to elicit testimony about the details of the pursuit or the car's recovery—i.e., she had not planned to call Deputy Webb—because no driver had been identified at that time. The court expressed that ideally, they would have someone from Contra Costa testify about taking possession of the car, sending it to the tow yard, and having it sent to Sacramento.

The prosecutor said that because of the defense's motion, she had asked a detective in Sacramento to try to contact the officer in Contra Costa County who had been involved in the pursuit. She stated she did not have a name to provide at the time, but that she would keep the defense and the court apprised of who she would call as a witness and regarding supplemental documentation related to that witness.

2. The First Day of Trial, October 18, 2022

a. Opening Statements and Witness Examination

Both parties delivered their opening statements the morning of October 18, 2022, and the People began presenting their witnesses.

K.M. testified. Asterlin made evidentiary objections during K.M.'s direct and redirect testimony. Asterlin also cross-examined K.M., bringing forth answers that possibly cast doubt on the reliability of K.M's recollection of events the day she was attacked.

The officers who responded to K.M.'s 911 call also testified, and Asterlin cross-examined them. Asterlin established no witnesses or videos captured defendant in the Mercedes at the scene of the attack.

Detective Derrick Cannedy was called as a witness for the prosecution. Asterlin objected with some success to Detective Cannedy's testimony. When Asterlin cross-examined Detective Cannedy, he asked questions regarding defendant's condition when Detective Cannedy interviewed him and the conditions under which he conducted the interview.

25

### b. Evidence Code section 402 Examination of Deputy Webb

The court paused Asterlin's cross-examination of Detective Cannedy to allow for an Evidence Code section 402 hearing to decide the admissibility of evidence that would be offered by Deputy Webb, who was the officer the People identified after Asterlin raised a chain-of-custody issue in his motion in limine relating to the Mercedes and its contents. One of the issues addressed at the hearing was a report Deputy Webb had authored regarding his chase of the Mercedes and the recovery of the car. Though the report does not identify the driver of the car, which is consistent with the prosecutor's representations at the motion in limine hearing, it does include a physical description of the driver Deputy Webb would later give at trial.

After the Evidence Code section 402 hearing, Asterlin objected to "this information" coming in on the grounds that it was late discovery. Asterlin complained that the late discovery of this information made it impossible for him to look into Deputy Webb's story about seeing the driver well enough to identify the physical features Deputy Webb claimed to see.

Initially, the court opined that the issue was not so much one of late discovery as it was one of a late investigation, because in not investigating the chain of custody the People never got the report. The court reasoned it was not a situation where the People had discovery and chose not to give it to the defense. After some argument from Asterlin, the court changed its opinion regarding whether it was late discovery: the court stated that technically the report did exist and was under law enforcement control, making it a late discovery issue, even if the District Attorney's office provided it late because Deputy Webb had not sent his report to Sacramento County earlier.

Still, the court concluded, "this is not a willful failure to discover something." Because the court did not believe it was a willful discovery violation, it said it would not exclude it, but would give a jury instruction regarding late discovery of the information.

26

### 3. Second Day of Trial, October 19, 2022

#### a. Pre-Testimony Discussions

Before the court brought the jury in on the morning of October 19, 2020, it went on the record at Asterlin's request.

Asterlin said, "[t]here is an·additional People's witness regarding pinging the cell phone in the Bay Area that's supposed to accompany Officer Webb's testimony." He stated the material had come in a little over 24 hours before and that he had no time to go look at the scene, and he declared himself "IAC" (ineffective assistance of counsel) at that point due to the court letting in "last-minute pieces of information." He added that the prosecutor was then offering "two additional exhibits that outline the [cell phone] data pinging in the Bay Area" and that these exhibits had not been "disclosed" until the day before.

When the court asked why the parties had not discussed the issue of the new exhibits the day before, the prosecutor said the witness who was going to testify about cell tower "pinging" was not new, and the data that would be discussed was not new data. Rather, the prosecutor had simply asked the cell phone data expert to plug in and confirm some information regarding a cell phone hit some six hours after the November 20, 2020, chase, which had come to light with evidence offered by Deputy Webb. The prosecutor stated that the cell phone data had originally been discovered to defendant when he was representing himself, and that she sent a copy to Asterlin as a courtesy on September 15, 2020.

Asterlin expressed disagreement with the prosecutor's position, noting he does not have a program that works with the type of data released, and he must check it manually. He stated nothing had been "referenced after the November 8th date," before the trial. He stated, "I want to make it abundantly clear [that] I am IAC at this point. I'm not

27

prepared to go forward on this witness." Asterlin represented he needed time to look into the Contra Costa chase in more detail.

When the court asked Asterlin if he had been able to check the location of the car chase and recovery on Google Earth, Asterlin said he had been able to, but the available images are not taken at night. The court noted the condition of the road where Deputy Webb had described the chase—a clear night, after dark, on flat terrain, with the only ambient light being from headlights in the area—and observed those conditions could easily be created at night somewhere else. Once the conditions were recreated, the court stated, one could check whether they could see a person from two car lengths away. Asterlin argued he did not believe the lighting conditions could be recreated.

The court concluded the cell phone data had been discovered at least 30 days before trial. So, even if the expert had done some new work with that data in the prior 24 hours, the data was still all there in the detail records that had been provided.

The court concluded there would be no real value to continuing the trial to allow Asterlin time to view the location of the Contra Costa chase.

However, the court then recognized Asterlin could use more time to go over the cell phone data given the new exhibits the expert had put together as part of his recent review of November 20, 2020, data. It asked Asterlin how long he would like to have to go over it, and Asterlin responded, "I need a day." The court then discussed which witnesses the People planned on calling that day and proposed they finish the cross-examination of Detective Cannedy in the morning, call Deputy Webb, and then break early for the day to give Asterlin additional time to prepare before proceeding with other witnesses. Asterlin said that would be acceptable.

b.  Witness Testimony

After the morning's discussion, defense continued his cross-examination of Detective Cannedy. Overall, Asterlin's cross-examination of Deputy Cannedy was quite

28

thorough and explored a variety of avenues Detective Cannedy conceivably could have pursued in his investigation but did not.  When he completed his cross-examination, Asterlin stated he would "subject [Detective Cannedy] to recall."

Deputy Webb then testified.  Asterlin interposed an objection while the People conducted direct examination.  Asterlin also cross-examined Deputy Webb, during which he asked questions that revealed possible difficulties Deputy Webb may have had in viewing the driver of the Mercedes during the chase on November 20, 2020.

### 4. Third Day of Trial, October 20, 2022

#### a. Early Morning E-mails

Included in the Clerk's Transcript are a series of e-mails Asterlin sent, which the trial court allowed him to file and include in the record.

In an e-mail with a 7:34 a.m. time stamp dated October 20, 2022, Asterlin wrote (1) he needed a day to prepare for the "supplemental report and expert opinion"; and (2) that he had been "denied time . . . to prepare for" Deputy Webb, "and provided approximately two hours to arrange for a response to" a supplemental expert report, which was not enough time.  He said he would not be able to proceed with the defense case until the following Monday, because he needed to "cure" the late discovery by the prosecution and hopefully arrange for a rebuttal witness.  He wrote that at that point he was "IAC" and not ready to proceed.

#### b. Redirect of Detective Cannedy

The morning of October 20, 2020, when the People said they were recalling Detective Cannedy, Asterlin objected.  He explained, "Defense has not been allowed the opportunity to make a motion, not ready to go forward."  The court responded, "[a]ll right.  Bring the jury in.  Motion's denied."

Asterlin then, presumably while sitting in court, sent e-mails to the court noting the jury was called in before defendant was dressed for trial, objecting to moving forward

without being allowed to make a record, and stating he planned to file a "formal motion for IAC and mistrial as I am not prepared to proceed, the court is not allowing the defense to make a record and affirmatively taking steps to prevent making an adequate record for the reviewing court."

The People called Detective Cannedy for redirect.

When the court announced it was the defense's turn to cross-examine Detective Cannedy, Asterlin declared, "I'm not ready to go forward, Judge." The court asked, "[w]ould you like to cross-examine?" Asterlin repeated, "I'm not ready to go forward." The court cautioned Asterlin, "[a]ll right. So this is your opportunity to cross-examine the [detective]. If you choose not to cross-examine the detective, the detective will be released." Asterlin responded, "[l]et the Court do what the Court's going to do." The court excused the detective. When Detective Cannedy asked if his being excused as a witness included recall, the court stated he was excused "for all purposes."

### c. Testimony of Dr. Rachel Russo

After Detective Cannedy was excused, the People called Dr. Russo. Asterlin cross-examined her. He asked if any other injuries were found on K.M., specifically asking if any injuries were found on her wrists, where K.M. had testified defendant had left a mark. Dr. Russo said there were no other injuries, including on the wrists.

### d. Cell Phone Expert Testimony

After Dr. Russo, the People called Garbutt. Before Garbutt got on the witness stand, Asterlin objected "due to the emails" he had sent the court, stating that "[a]t some point [he] need[ed] to make a record." When the court said it had not received any e-mails, Asterlin said he had sent several that morning. The court responded, "[n]evertheless, I did not get any emails. You may not communicate with the Court ex parte." The People then commenced their direct examination.

30

When the People asked to have Garbutt declared an expert, Asterlin objected based on "the earlier communications that have still not been addressed by the Court"— i.e., the e-mails he had sent that morning. When the court asked if Asterlin would like to voir dire Garbutt, Asterlin responded, "I am not prepared to proceed with this witness, you Honor." The trial court told the People to continue with their direct examination.

While Garbutt was on the stand, Asterlin sent an e-mail to the court complaining that it was not allowing defense objections to be heard, and stating he was "IAC to proceed with cross" of Garbutt.

When the People completed their direct examination of Garbutt, the court indicated to Asterlin that it was his turn to cross-examine the witness. Asterlin announced, "Defense is not prepared to cross given the late discovery. I need a motion on that your Honor."

The court asked Asterlin if he was saying he was not prepared to cross-examine the witness regarding any of his testimony, and Asterlin suggested it was not appropriate for him to respond to that in front of the jury. The court asked again if Asterlin was saying he was not prepared to question Garbutt about anything Garbutt had just testified about. Asterlin responded, "[t]hat is not what I'm saying." The court told Asterlin he could then proceed with his cross-examination and Asterlin asked to speak to the court, a request the court refused. Asterlin stated, "Judge, I'm not prepared to go forward with this witness given the late discovery. Sorry." The court then excused Garbutt.

The People rested their case, subject to the admission of exhibits.

### e. Defense Announces It Is Not Ready to Proceed

After the People rested the court asked Asterlin to call the defense's first witness. Asterlin announced he was not ready to proceed.

31

The court told Asterlin to call his first witness or rest, and Asterlin responded, "I'm not resting and [I'm] not prepared to proceed with the defense case. The court has not allowed me the opportunity to make a record."

When the court pressed Asterlin regarding if he had a witness available, the defendant spoke out saying, "[s]o you all are really going to take my life in your hands right now, right?" Asterlin responded he had a witness in the courtroom, but said, "I'm not prepared to go forward with this witness right now given the late discovery. I've tried to make a motion several times."

The court sent the jury out of the courtroom.

The court then asked Asterlin why he was not calling defendant at that time, and Asterlin said it was because of the late discovery.

The court expressed its belief that they had "hashed all this out" the day before, but Asterlin disagreed, noting he had sent the court three e-mails that morning.

The court reminded Asterlin that it does not accept ex parte communications from lawyers via e-mail but told him he could make his record then.

Asterlin then listed a variety of grievances with how the trial was going. His complaints included a range of topics. They included (1) that the court was "not taking the stand" to allow counsel to make argument on the record; (2) that the jury had been brought in that morning before defendant was adequately dressed, notably because he had not changed out of the shoes he wore in custody or put on a tie; (3) that due to late discovery and exhibits (i.e., Deputy Webb's report and the new exhibit with Contra Costa cell phone data), he had lost time to discuss things with his client; (4) that Detective Cannedy had been released and the court would not hear counsel; and (5) that Garbutt had been called to testify that morning, even though Asterlin had indicated he needed a day to prepare to cross examine him, and the court had promised him time the day before.

Asterlin declared that he was "IAC" and stated he had "no doubt there will be a conviction in this matter." He argued the case needed to "come back" for there to be a

"proper trial" where defendant would have enough time to go over all the last-minute discovery with counsel. Asterlin stated he would not be able to proceed with his case before the upcoming Monday.

The court then engaged in a lengthy discussion with Asterlin, attempting to address his concerns one-by-one. Much of the discussion was duplicative of prior discussions between counsel and the court. The court began by reviewing the issue of defendant's dress that morning, bringing in the bailiff to ascertain what had happened. The court found no prejudice resulted from the incident.

The court provided a recitation of its thoughts regarding Asterlin's stated concerns. First, the court opined that Asterlin appeared to be strategically trying to set up an appellate issue by refusing to cross-examine a witness. The court stated it had observed that Asterlin had "been fully prepared to cross-examine every witness that ha[d] testified." The court said, "[y]ou have thoroughly cross-examined them and at times I thought in ways that were frankly fantastic and . . . you've been able to bring more potential reasonable doubt with less than I have seen in some time." The court said Asterlin had been able to show that Detective Cannedy had not done as thorough a job as he should have and to "poke holes" in whether the defendant was identified at the gas station or in Contra Costa. The court said Asterlin had been fully prepared at every stage of the proceedings and done a very good job. The court said, "why you are now suggesting that you are IAC is beyond me other than perhaps it's a cynical ploy to, you know, get some sort of appellate issue."

Regarding the time it had provided Asterlin to prepare, the court noted it did break early the day before.

The court opined that Asterlin had enough information to cross-examine Detective Cannedy that morning regarding the issues Detective Cannedy testified about.

The court noted that most of Garbutt's testimony had been regarding the November 8, 2020, call data, and that the defense had that data for months, and the visual

33

representations about it well before trial. It noted Asterlin could have cross-examined Garbutt on those issues and characterized his refusal to do so as a "cynical ploy for some sort of appellate issue." With respect to the two exhibits regarding the Contra Costa data, the court noted that a cross-examination on them would have been more technical, with issues raised regarding the November 8, 2020, data applying with equal force. The court opined that Asterlin's position regarding Garbutt seemed to be "a strategic decision on [Asterlin's] part because it's frankly not that important to [the defense's] ultimate theory of the case."

The court concluded it had not heard a single thing that gave the court pause as to whether the defense needed more time. Nonetheless, the court inquired as to what Asterlin was asking for "right now."

Asterlin continued to insist his defense needed a day. He said the late evidence regarding Contra Costa County disrupted his defense. He characterized the time he had to "recover" due to the new information was "two hours," when business offices close. The court disagreed with that characterization, stating Asterlin could have worked late in the evening or gotten up earlier in the morning, because that is what trial lawyers do. It also said that Asterlin could have asked for more time when they discussed giving him more time the day before. Asterlin said he had tried to get another hearing after lunch to address the amount of time he had given the length of testimony but had been denied the opportunity.

Asterlin insisted he had not had enough time to prepare to ask Detective Cannedy about search issues, because his time was "burned up with Webb," and he had not been given enough time to adjust to information he had only recently been provided.

The court noted it was 11:20 a.m. and said it would give Asterlin until 1:30 p.m. to prepare. Asterlin said, "we can just go into argument. I can't be prepared by then. . . . I just want to get this to the appellate court. He's going to get convicted." Asterlin insisted he needed a day to meet with defendant to go over material they had not previously

34

discussed.  The court gave him two hours, opining the new issues could be covered in that time.

### f.  Court Continues the Case to the Following Monday

When court resumed for the afternoon, the jury was seated immediately.  The court informed the jury that something had happened that would require them to lose half a day, and excused them, directing them to return Monday morning.

After the jury was excused, Asterlin presented a packet of the e-mails he had sent to the court, and requested they be made part of the record on appeal.  The court reviewed the e-mails and agreed to make the e-mails part of the record.

The court then addressed Asterlin.  It noted that when the case had broken in the morning, Asterlin had stated he was IAC and could not move forward.  The court stated that when defendant left the courtroom "he was obviously rightfully quite upset because it has been reported to me by my staff that you told your client here when I was not in the court room that you would not see him over the lunch hour, at least not for a while, because you needed to go eat lunch and walk your dog . . . ."  The court recognized that "everybody needs to eat lunch," but still characterized Asterlin's actions as "pretty outrageous conduct."  The court stated that Asterlin was "supposed to be representing [his client] and putting his interest first."  It noted defendant had looked as if he was about to cry when he left that morning.  The court surmised that Asterlin, had "taken such a position of animosity towards the proceedings that it might impact [defendant's] ability to get a fair trial."  On that basis, the court continued the trial until the following Monday, giving the defense a long weekend to prepare.

The court then asked Asterlin if there was anything else he wanted to put on the record.  Another lengthy discussion ensued.

During the discussion, Asterlin stated that he was making a request for a "new trial due to the IAC and for what happened today." The specifics of that motion are included in the background section of Part III of this discussion.

### 5. Fourth Day of Trial, October 24, 2020

#### a. No Defense Witnesses

Trial resumed on the morning of Monday, October 24, 2022.

Asterlin explained that a witness he wanted to call was too ill to attend court.

After Asterlin stated defendant did not wish to testify, the court confirmed with the defendant that he did not wish to testify.

The court then asked if the defense was resting its case, at which point Asterlin responded, "[t]he defense does ask to call Detective Cannedy."

Asterlin stated he had not subpoenaed Detective Cannedy, but had subjected him to recall. The court agreed, but noted that later, after Asterlin had chosen not to ask Detective Cannedy questions following the People's redirect, the court excused Detective Cannedy for all purposes, and the defense did not ask to have Detective Cannedy subject to recall at that time.

Asterlin claimed the court released Detective Cannedy over the defense's objection, which the court said was "absolutely false." The court stated it would not have released Detective Cannedy if the defense had stated it wanted him subject to recall.

#### b. Admission of Exhibits, Jury Instructions, the People's Closing

The court and counsel then discussed the admission of exhibits and jury instructions.

The court instructed the jury. The instructions included the following version of CALCRIM No. 306: "Both the People and the defense must disclose their evidence to the other side before trial within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence to counter opposing

36

evidence or to receive a fair trial. [¶] An attorney for the People failed to disclose Deputy Webb's report from Contra Costa County Sheriff's Department regarding the pursuit involving [K.M.'s] vehicle on November 20, 2020, the condition of the vehicle after the pursuit, and observations of the driver of that vehicle. [¶] If you find that such late discovery deprived the defense of the opportunity to fully counter the evidence or defend against it, you may but are not required to disregard that evidence in its entirety."

After a morning recess, the People gave their closing argument, which continued after a lunch break. During the People's closing, Asterlin made objections.

### c. Defense Closing

The court told Asterlin he could begin his closing argument. Asterlin said he was not ready to proceed. He said there was a lot of material to go through.

When the court asked Asterlin if he was asking for a continuance, Asterlin responded that he was asking for a stay so he could get a writ.

The court directed the jury to take its break.

The court again asked Asterlin if he was seeking a continuance.

Asterlin stated he would not be prepared to proceed until the next morning, because he needed to complete his power point, as he had spent the weekend attending a training. He asked for a continuance or for a stay so he could "seek a writ with the Third and let them know about how hostile this Court has been to the defense." Asterlin continued elaborating why he felt the court had been unfair and hostile.

The court was unmoved. It reminded Asterlin he had three and one-half days to prepare and stated if he had chosen to attend a symposium instead, that was his choice. It denied the request for a continuance or stay.

The court warned Asterlin that he was "very close to being in contempt." It explained this was because, "[o]n two separate occasions . . . in front of the jury [Asterlin] has objected to continuing and doing anything further. For example, last week

37

when he was asked to begin cross-examination, he refused to cross-examine witnesses and in front of the jury acted in a manner that was suggestive . . . to the jury that his client was not receiving a fair trial." The court ordered Asterlin to not make further disparaging remarks towards the court before the jury or to suggest in front of the jury that defendant was not getting a fair trial. It told Asterlin he "must proceed directly into closing arguments" when the jury was brought back in.

Asterlin said he wanted to be relieved, that his head was "all messed up," and that he did not know what to do. He said he needed counsel for himself, insisting he did not understand what the court was expecting from him as he was not ready to proceed.

Asterlin and the court continued to go back and forth. The court eventually directed court staff to bring the jury back in. As this was happening, defendant said, "you're going to force me to sit here with someone who doesn't have a closing argument?"

When the jury was seated, the court directed Asterlin to make his closing argument.

Asterlin asked to approach the bench, and when the court denied that request Asterlin said "[t]he defense waives." When defendant began to ask, "is my life going to get took like this . . . " the court directed the jury to step outside.

Outside the presence of the jury, the court urged Asterlin to consider how a decision to waive a closing argument might impact his standing with the bar. Following some discussion during which Asterlin communicated he was feeling quite ill at ease, and defendant expressed his frustration with the court for forcing his lawyer to "pick between his career and representing me," Asterlin asked the court for an hour to further prepare his closing. The court gave him 20 minutes.

After the 20-minute break, the jury was brought back in.

Asterlin then gave a closing argument. The closing touched on K.M.'s use of alcohol and methamphetamine on the day she was attacked. It pointed out that on the 9-

1-1 call, K.M. said she had been stabbed five times, but Dr. Russo's testimony did not support that. Asterlin encouraged the jury to consider these factors when deciding how reliable K.M.'s memory was with respect to the incidents of November 8, 2020.

Asterlin argued that while the cell phone data from November 8, 2020, may have confirmed the path of K.M.'s travel, it did not account for other possible scenarios in which the car may have stopped or who else may have been in the car. Asterlin also noted the lack of video corroborating how many people were in the car at the gas station. Asterlin argued there was no verification that defendant was the person using the phone with which tracking data was obtained.

Asterlin made arguments regarding the nature of K.M.'s wounds and her level of disability immediately following the attack, and asked the jury to consider if that condition reflected that the person who stabbed her intended to kill her.

With respect to the November 20, 2020, chase with Deputy Webb, Asterlin identified a distance of roughly 15 feet in the courtroom, reminded the jury of the general conditions including the lighting, referred to exhibits that would show what headlights would have seen in the car, and asked them to consider common sense as to what Deputy Webb would have been looking at.

Asterlin argued that given the length of time between the attack and when the car was located, one would expect there to be more evidence—e.g. fingerprints, DNA, license plate reads—that defendant had been in the car over those 12 days.

We note at this point that at a later hearing, when Asterlin again tried to repeat his complaints with the trial court, the court noted his closing argument was one hour and included a PowerPoint presentation.

After Asterlin finished the defense's closing argument, the People closed. Asterlin raised objections during the rebuttal.

### 6. Bifurcated Trial

At the bifurcated bench trial regarding prior offenses and factors in aggravation, Asterlin noted that the offenses at issue were 30 years old. He argued that, given the age of the offenses and that defendant had done "well enough" to get paroled, they did not suggest an increasing seriousness of crimes.

### 7. First Sentencing Hearing, December 9, 2022

On December 9, 2022, counsel appeared for judgment and sentencing.

Asterlin sought a motion to continue the matter to give him time to file a new trial motion. He stated he had filed a 20-page motion but that it was "vastly incomplete." The court noted the motion for a new trial as filed left much to be desired, referring to it as "the single worst cut-and-paste job I've ever seen." The court said the motion referred to people and facts that had nothing to do with defendant's case. Asterlin explained this was why he needed a continuance to "complete" the motion; he had been in trial and that was all he had time to do.

Asterlin reraised some of his complaints with how the trial had been conducted. The court told Asterlin he was being incredibly disrespectful to the court, at a level "I don't think I've ever seen before." Asterlin responded that he was "not trying to be disrespectful to" the court, and that he was just trying to give his client his defense. He said he was trying to "zealously defend" his client.

The court continued the hearing to February 10, 2023.

### 8. Second Sentencing Hearing and *Marsden* Motion, February 10, 2023

On February 10, 2023, Asterlin sought another continuance. He said he had not filed anything new on the motion for new trial, in part because he had not been able to find the time to secure funding to obtain transcripts he needed to finish the motion.

The People objected to any further continuances. The court stated it would deny the motion to continue as untimely and on the basis that quite a bit of time had already passed since the verdict had been entered.

Defendant expressed his frustration that he was not sure what was going on and that there had been things he had hoped to cover at a motion for new trial. The court cautioned defendant that he was represented by counsel, and it stated if defendant was making a motion for a new attorney that would need to be dealt with in a closed hearing. Defendant said he was "going to have to exercise that right."

The court then asked the prosecutor to step outside the courtroom and held a *Marsden* hearing.

At the hearing, defendant listed a variety of concerns he had regarding Asterlin's representation, including what defendant saw as Asterlin's failure to communicate with him regarding the new trial motion, and defendant's view that Asterlin was not sufficiently prepared during trial and did not pursue avenues defendant felt would exonerate him.

When the court asked Asterlin questions about his practice experience in general and specifically about his representation of defendant, Asterlin gave largely non-responsive and vague answers, stating he was not prepared for a *Marsden* hearing that day. The court characterized Asterlin as "disrespectful as hell."

Finally, the court announced it had "heard enough." It stated, "my entire interaction with Mr. Asterlin since the time this case came to this department has been unusual. I don't think I've ever seen the kind of behavior out of an attorney as I've seen out of Mr. Asterlin." The court concluded there had been a complete breakdown of the relationship between defendant and Asterlin and that it was mostly Asterlin's fault, and it granted the motion. The court said it would appoint a new attorney for defendant.

The court then continued the matter to February 24, 2022, when the court anticipated it would identify new counsel for defendant.

41

### 9. Third and Final Sentencing Hearing, February 24, 2022

On February 24, 2022, Asterlin appeared as retained counsel for defendant.

Asterlin had filed a motion for new trial, to which the prosecutor responded orally during the hearing.  The court denied the motion.  At some point, the court had defendant removed and placed in another department to participate via Zoom, and Asterlin accompanied him.

Asterlin argued that it would be an error to sentence defendant to consecutive terms for the two counts, and he encouraged the court to consider the midterm as the stabbing was "indiscriminate" and did not "target specific areas of the body."  He urged the court to stay away from the emotional aspects of the victim's injuries and look to the actual conduct.

### B.  Rules and Standards Applicable to Ineffective Assistance of Counsel Claims

Under the Sixth Amendment of the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel at trial.  (*People v. McKenzie* (1983) 34 Cal.3d 616, 626 (*McKenzie*).)

The right to counsel is the right to the effective assistance of counsel.  (*McKenzie, supra,* 34 Cal.3d at p. 626; *Unites States v. Cronic* (1984) 466 U.S. 648, 654 (*Cronic*); *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)  "The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.  . . .  [I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."  (*Cronic*, *supra*, 466 U.S. at pp. 656-657, fn. omitted; *In re Avena* (1996) 12 Cal.4th 694, 727.)

A defendant has the burden of proving ineffective assistance of counsel.  (*Cronic*, *supra*, 466 U.S. at pp. 658; *People v. Bell* (2020) 48 Cal.App.5th 1, 22.)  Ordinarily, to establish such a claim, a defendant must show both that (1) counsel's performance was

deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland*, *supra*, 466 U.S. at pp. 687-688; *Bell v. Cone* (2002) 535 U.S. 685, 695 (*Cone*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216; *People v. Ruiz* (2023) 89 Cal.App.5th 324, 329.)

However, in *Cronic*, *supra*, 466 U.S. at pages 658-660, the United States Supreme Court identified three scenarios where prejudice from ineffective assistance is presumed. (See also *Strickland*, *supra*, 466 U.S. at p. 692.) "First and 'most obvious' was the 'complete denial of counsel.' [(*Cronic*, *supra*, 466 U.S. at p. 659.)] A trial would be presumptively unfair, [the Court] said, where the accused is denied the presence of counsel at 'a critical stage,' [(*id.*, at pp. 659, 662)], . . . Second, [the Court] posited that a similar presumption was warranted if 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.' [(*Cronic*, *supra*, at p. 659.)] Finally, [the Court] said that in cases . . . where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. [(*Cronic*, *supra*, at pp. 659-662.)]" (*Cone*, *supra*, 535 U.S. at pp. 695-696; see also *In re Avena*, *supra*, 12 Cal.4th at p. 727.) The high court reasoned prejudice is presumed in these three instances, because they are circumstances that are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." (*Cronic*, *supra*, 466 U.S. at p. 658, fn. omitted; *Cone*, *supra*, 535 U.S. at p. 695; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1104; *In re Avena*, *supra*, 12 Cal.4th at p. 727.)

C. Analysis

Defendant points to three incidents from the trial in arguing that Asterlin's representation of him was ineffective, reasoning Asterlin "essentially quit after cross-examining Deputy Webb." First, he notes that when the People completed a re-direct of Detective Cannedy after recalling him, Asterlin stated he was not prepared to go forward

43

and did not ask Detective Cannedy any questions, and then Detective Cannedy was released. Next, he notes that Asterlin did not cross-examine Garbutt, the cell phone expert, at all. Finally, he argues that Asterlin only made his closing argument after he was threatened with contempt by the trial court.

In his opening brief, defendant acknowledges this "case does not fall squarely within either the *Strickland* box or the *Cronic* box." He characterizes the issue in this case as "whether this case is governed by the *Stickland* requirement" to show prejudice "or the presumption of prejudice standard in *Cronic*." Then, he argues, "[s]everal factors compel application of [the] *Cronic* standard which requires reversal without a showing of prejudice." The "factor[s]" defendant identifies are that the jury witnessed some of Asterlin's recalcitrant behavior, that it would be reasonable to infer that appellant's decision not to testify was impacted by the "chaos surrounding his defense attorney," and that Asterlin was clearly emotional and in some sort of heightened psychological state by the end of the trial.

Based on the facts defendant highlights in his ineffective assistance argument in his opening brief, the thread of the argument itself, and clarifications made to the argument in his reply brief, it appears defendant believes we should treat this case as falling into the second or third *Cronic* category. We are not persuaded.

Starting with the second *Cronic* category, we note that the high court has subsequently clarified that when it "spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [it] indicated that the attorney's failure must be complete. [It] said[,] 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.' [(*Cronic*, *supra*, at p. 659 (emphasis added).)]" (*Cone*, 535 U.S. at p. 697.)

Here, Asterlin did not *entirely* fail to test the prosecution's case. Rather, he elected not to take specific actions.

44

In *Cone*, *supra*, 535 U.S. at pages 696-698, the Court considered an argument that a counsel's "failure to adduce mitigating evidence and the waiver of closing argument" during a sentencing proceeding placed his actions into the second *Cronic* category and rejected the argument. The Court explained the defendant's "argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, *this difference is not of degree but of kind*." (*Id.* at p. 697, fn. omitted, italics added.) The Court reasoned, "[t]he aspects of counsel's performance challenged by respondent . . . are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components." (*Id.* at pp. 697-698.)

Here too, the incidents defendant highlights do not account for the whole of the trial. Before these incidents, Asterlin had among other things (1) given an opening statement; (2) engaged in thorough cross-examination of the victim, the responding officers, Detective Cannedy following his direct, and Deputy Webb; and (3) raised arguments regarding the late discovery of the Contra Costa report that persuaded the trial court to give an instruction on the late discovery issue.

Nor does the record reflect that Asterlin's cross-examination of Deputy Webb was the end of Asterlin's efforts to test the prosecution's case at trial. After Deputy Webb testified, when defendant claims Asterlin "essentially quit," Asterlin (1) cross-examined Dr. Russo; (2) made a motion for a new trial based on his various asserted grievances regarding how the case was proceeding; and (3) delivered a closing argument. Asterlin may have expressed a desire to quit, but he did not actually quit and he continued to advocate for his client, as reflected by his closing argument and how it addressed testimony of the witnesses he declined to cross-examine. Even Asterlin's behavior can be seen not as not quitting, but as advocating for his client when he felt the defense had been hampered by late discovery. And it is hard to see this behavior as entirely ineffectual:

45

Asterlin did get more time which he asked for, and the time given was generally more than the court initially had indicated it was willing to give.

Indeed, a closer look at the record reveals that even the witnesses Asterlin refused to cross-examine did not truly escape "the crucible of meaningful adversarial testing." (See *Cronic*, *supra*, 466 U.S. at pp. 656-657.) As the trial court noted, during his initial cross-examination of Detective Cannedy, Asterlin had demonstrated that Detective Cannedy had not done a "very thorough job" in his investigation, an impression that likely would have also influenced how the jury viewed his testimony on redirect. When Asterlin declined to cross-examine Garbutt, he stated before the jury that he was not prepared, "given the late discovery." Given he was aware the jury would be receiving a late discovery instruction, this action could have been a tactical decision on Asterlin's part—after weighing the pros, cons, and utility of cross-examining the expert—to focus the jury's attention on viewing the expert's testimony through the lens of the discovery issue.

Similarly, though he may have refused to give a closing argument at first, Asterlin ultimately did give a fairly lengthy and detailed closing in which he, among other things, made an argument that the cell phone data did not tell the whole story regarding the path the car traveled on November 8, 2020, and who might have been in the car.

Defendant's argument that we should presume prejudice under the third *Cronic* category is equally unpersuasive. On this record, we are not convinced that Asterlin was in some sort of heightened emotional state that prevented him from being effective. After he insisted he could not give a closing argument, the court gave him 20 minutes to collect himself, and he managed to give an organized closing argument that challenged the People's case.

We also do not find it wise to lend credence to the notion that when counsel voices he is upset by the threat of contempt, his stated distress can provide sufficient basis to presume prejudice under the third *Cronic* factor. " 'Upon the trial judge rests the duty of

seeing that the trial is conducted with solicitude for the essential rights of the accused.' [Citations.]" (*McKenzie, supra,* 34 Cal.3d at p. 626.) "In order to implement this duty, the trial judge is vested with both the statutory and the inherent power to exercise reasonable control over all proceedings connected with the litigation before him." (*Ibid.*) Among these powers is the power to punish for contempt of court, and the related ability to, "order defense counsel to participate in the trial and threaten to impose the sanction of contempt if he refuses to do so." (*Id.* at p. 627.) This power exists, in part, so that a trial court can ensure a criminal defendant gets a fair adjudication and proceeds with the assistance of counsel when he has not waived his right to counsel. (*Id.* at pp. 626-627.) A finding that the third *Cronic* category is triggered on this record would minimize the utility of the trial court's ability to caution a recalcitrant Asterlin of the risk of contempt findings.

Defendant did not suffer the ineffective assistance of counsel as the law defines it.

III

*Motion for a New Trial or Mistrial*

Defendant characterizes the motion the defense made on the afternoon of October 20, 2022, as a motion for mistrial and argues the trial court erroneously denied the motion. As part of their responsive argument, the People argue that because the defense actually made a motion for a "new trial" on October 20, 2022, a claim that the trial court ought to have granted a mistrial at the time has been forfeited. Because we can quickly dispose of this issue if we treat the subject motion as one for a mistrial under the standard of review defendant argues applies, we will proceed as if the motion had been cast as a motion for mistrial during the trial.

A. Additional Background

On October 20, 2020, after the court continued the trial to the following Monday, Asterlin made a request for a "new trial due to the IAC and for what happened today."

47

The court, in discussion with counsel for both parties, identified six grounds the defense was claiming as a basis for the motion for a new trial. First, the motion was based on the late discovery of Deputy Webb's report. Second, it was based on a lack of sufficient time to prepare to cross-examine Garbutt on the two new exhibits he prepared using the data from Contra Costa County on November 20, 2020. Third, it was based on the court denying a request for a longer continuance to enable the defense to prepare for Garbutt's testimony. Fourth, it was based on the court showing a lack of respect to the defense. Fifth, it was based on the court releasing Detective Cannedy. Sixth, it was based on the defense's lack of opportunity to create exhibits related to Detective Cannedy's search of the vehicle and the stills at the gas station once the defense was aware of the evidence that would be presented placing defendant in Contra Costa County.

After hearing from the parties, the court gave its detailed ruling denying the defense motion.

As to the first issue, the discovery violation, the court noted they had already discussed the issue a lot. The court noted it had agreed to provide the CALCRIM No. 306 instruction and allowed an Evidence Code section 402 examination of Deputy Webb the day before he testified. It observed the key issue with Deputy Webb was whether the person Deputy Webb saw in the car was the defendant, and opined that Asterlin had, in fact, done an excellent job pointing out all the possible problems with the deputy being able to see the driver. The court also opined that, with the remedies provided, Asterlin had been given sufficient time to consider the late discovery, even though that might have meant he would have to put in some long hours.

The court's discussion of the second and third issues—regarding a lack of time to prepare for Garbutt's testimony and to cross-examine him regarding the new exhibits— blended. The court noted that Asterlin had sent the court e-mails many times, and it surmised that Asterlin could have also sent e-mails to experts to address issues raised in the new exhibits. It repeated a previously raised point that the defense had the data with

48

which the two Contra Costa mapping exhibits had been made for months, and that, even assuming he only had the exhibits for a short time, Asterlin still could have had an expert look at them if he hired one. The court also rejected the idea that it had not granted the defense the continuance it had asked for, and stated had the defense wanted a longer continuance than the court gave, Asterlin could have placed that request in a motion and filed it. The court said it would have addressed a filed motion. The court repeated its observation that the November 20, 2020, data had taken only a very short time during Garbutt's testimony. It said Asterlin could have cross-examined Garbutt on everything else then asked for a break to look into the November 20, 2020, data.

As to the fourth issue, the court stated it did not believe asking Asterlin if he wanted to cross-examine witnesses—and perhaps using a tone than was sterner than usual—was disrespectful. The court believed that, in fact, it was Asterlin who had shown a lack of respect for the court in using a petulant, clearly annoyed tone. The court said, "I was attempting to get you to cross-examine, and you did not want to cross-examine. . . . I don't think there was any lack of respect towards you. I've tried to treat you respectfully at all times and will continue to do so. I know you are vigorously trying to defend your client, and I do respect that."

As to the fifth issue, the court noted Asterlin knew Detective Cannedy was going to be in court that morning for a redirect, and he had the opportunity to thoroughly cross-examine him, but chose not to. The court stated when it asked if Detective Cannedy could be excused, it looked at both counsel, and neither party said anything. It noted Asterlin had not asked at that time that Detective Cannedy remain subject to recall.

As to the sixth issue, regarding preparing exhibits about the stills from the gas station, the court observed that Asterlin had previously asked Detective Cannedy a lot of questions about the missing surveillance videos. It stated Asterlin could have prepared something based on those answers but had chosen not to in time for Detective Cannedy's return to the witness stand.

49

B.  Analysis

"A trial court should grant a mistrial when it is informed of prejudice that is incurable by admonition or instruction.  (*People v. Dement* (2011) 53 Cal.4th 1, 40 [].) We review the denial of a motion for mistrial under the deferential abuse of discretion standard.  (*People v. Cox* (2003) 30 Cal.4th 916, 953 [].)  The trial court is vested with 'considerable discretion' (*Dement*, at p. 40) in determining a mistrial motion, because whether a particular incident is incurably prejudicial is 'a speculative matter' (*id.* at p. 39)."  (*People v. Murillo* (2014) 231 Cal.App.4th 448, 455.)

Defendant argues the trial court should have granted the motion as a motion for mistrial, because it "was clear by the time the mistrial motion was made . . . that there was no hope appellant was receiving a fair trial."  He then identifies various other factors he believes prove his point:  that Asterlin had refused to recross-examine Detective Cannedy, that Asterlin had refused to cross-examine Garbutt, that defense counsel had "cursed" at the trial court, and that defense counsel had eaten lunch and walked his dog rather than meet with defendant over the lunch hour.

We note defendant's analysis of this issue does not consider the actual bases for the motion which were identified by the trial court and carefully addressed on the record. That trial court's conclusions as to those points appear to be fair and carefully thought out.  Certainly, they appear firm enough that if defendant is not going to do the work to provide reasoned arguments, with legal citations, as to why the trial court abused its discretion in denying the motion on at least one of those bases, we are not going to do the work for him.

Additionally, even if the reasons defendant now identifies as reasons the motion ought to have been granted had been specifically articulated in the trial court, we would disagree with the defendant.  At the time the trial court denied the motion, it had just continued the trial so that Asterlin would have three days to prepare.  The court acted well

within its discretion at that point if it made the fair assumptions that (1) there may have been tactical reasons for Asterlin to not recross-examine Detective Cannedy and to not cross-examine Garbutt, and that Asterlin would deal with their testimony in presenting a defense or in a closing argument; and (2) Asterlin would use some time over the next few days to meet with defendant and prepare a defense.

Defendant has failed to show the trial court abused its discretion when it denied his motion on October 20, 2022.

IV

*Dismissal of Enhancements Under Section 1385*

The trial court imposed sentencing enhancements based on the defendant's use of a deadly weapon, the infliction of great bodily injury, and defendant's prior serious felony conviction. Defendant argues we must remand this case for resentencing because section 1385, subdivision (c)(2), subparagraphs (B) and (C), as added by Senate Bill No. 81 (2021-2022 Reg. Sess.) mandate dismissal of his enhancements. Defendant has forfeited this argument.

"In 2021, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill No. 81), which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (Stats. 2021, ch. 721, § 1.)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 674 (*Sek*).) These factors are set forth in subdivision (c)(2) of section 1385. (*Sek*, at p. 674, fn. 7.)

Section 1385 as amended provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the

mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2), italics added.)

Senate Bill No. 81 became effective on January 1, 2022, before defendant was sentenced in this case.  (*Sek*, *supra*, 74 Cal.App.5th at p. 674.)

In his briefing, defendant has not pointed to, nor have we found, anywhere in the record where he argued the court ought to have exercised its discretion under section 1385, subdivision (c), to dismiss the deadly weapons use and great bodily injury enhancements.  And in arguing in this court that the trial court ought to have dismissed these enhancements, defendant is essentially arguing that the trial court improperly considered—or failed to consider—the "mitigating circumstances" identified in subdivision (c)(2), subparagraphs (B) and (C), which the trial court was required to consider "[*i*]*n exercising its discretion under*" section 1385, subdivision (c).  (§ 1385, subd. (c)(2).)  Yet, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal."  (*People v. Scott* (1994) 9 Cal.4th 331, 356.)  Furthermore, defendant has not made an argument that forfeiture does not apply here.  Accordingly, we find defendant forfeited this argument by failing to raise it in the trial court.

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
MAURO, J.

_____
WISEMAN, J.*

_____
* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

53